**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

**TAWONA WARREN ANDERSON**                                          **PLAINTIFF**
*Guardian of the Person and Estate of Rayshawn Warren*

**v.**                                    **Case No. 3:18-cv-00231-LPR**

**DOYNE DRISKILL**                                                 **DEFENDANTS**
*Individually and in his official capacity as*
*a Police Officer for the City of Blytheville, Arkansas,*
**ROSS A. THOMPSON**
*Individually and in his official capacity as*
*Chief of Police for the City of Blytheville, Arkansas,* and
**CITY OF BLYTHEVILLE, ARKANSAS**

<u>**ORDER**</u>

Some cases try judges' souls.  This is one of them.  A man with mental illness, who was at most a misdemeanant, has died after being arrested; his mother, who is most assuredly in unbearable anguish, believes one or more of the arresting police officers or emergency medical technicians at the scene are to blame and wants them held to account.  Any human being would have the utmost sympathy for the Plaintiff in this case.  But judges are sworn to put aside such feelings of sympathy and to decide cases impartially—solely based on the law.  It is the only way our justice system can function fairly for all participants.  And it is what I do here.  Nonetheless, and as I have noted in a prior Order, this is precisely the type of case that warrants a hard second look from the Court of Appeals to ensure that my decision represents an accurate understanding and application of governing precedent.

On October 30, 2018, Plaintiff Tawona Anderson, in her capacity as the Guardian of the Person and Estate of Rayshawn Warren, filed a Complaint in the Circuit Court of Mississippi

County, Arkansas.[1]  She sued Officer Doyne Driskill (in both his individual and official capacities), Blytheville Chief of Police Ross Thompson (in both his individual and official capacities), and the City of Blytheville, Arkansas.[2]  In short, Ms. Anderson's Complaint alleges that Defendants violated Mr. Warren's First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution, and that Officer Driskill committed the common law state torts of assault and battery.[3]

On November 29, 2018, Defendants removed the case to the Eastern District of Arkansas.[4] A lot has happened since that time.  A fairly comprehensive procedural history can be read (and should be read) in the Court's relatively recent Order denying Plaintiff's Motion to Amend the Complaint.[5]  It's important to note here, however, that Officer Driskill, Chief Thompson, and the City of Blytheville are the *only* Defendants named in the Complaint.  Other officers and paramedics involved in Mr. Warren's arrest and transport are not named as Defendants.[6]

Defendants' Motion for Summary Judgment is now before the Court.  The Court has carefully considered the parties' evidence, briefing, and oral arguments.  For the following reasons, the Court concludes that the Motion for Summary Judgment should be granted in its entirety.

---

[1]   Defs.' Notice of Removal (Doc. 1) ¶ 1.

[2]   Pl.'s Compl. (Doc. 2).

[3]   *Id.* ¶¶ 2, 27–30.

[4]   Defs.' Notice of Removal (Doc. 1) ¶ 1.

[5]   *See* Order Denying Mot. to Amend (Doc. 70) at 1–7.

[6]   *See id.*  In December 2020, Plaintiff moved to amend her Complaint to add as Defendants Officer Nathan Krupin, Officer Santos Berumen, Officer Billy Hancock, Paramedic Anthony Johnson, Pafford Emergency Medical Services, Inc., and Pafford Medical Services, Inc.  *Id.* at 5.  This was more than two years after the Complaint was filed, more than fourteen months after the expiration of the original amendment of pleadings deadline, and more than six months after the expiration of the second amendment of pleadings deadline.  After careful deliberation, the Court denied the Motion.  The Court found that Plaintiff failed to act diligently, and thus failed to satisfy the good-cause standard for amending her Complaint outside of the time established in the Court's applicable scheduling orders.

## Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[7] The movant bears the initial burden of showing (1) the absence of a genuine dispute as to any material fact and (2) that a rational juror could not possibly find for the nonmoving party based on the undisputed facts.[8] If the movant successfully makes this showing, the burden then shifts to the nonmoving party to establish that there is some genuine and material issue to be determined at trial.[9] The nonmoving party may not rest solely upon the allegations in its pleadings.[10] To survive summary judgment, the nonmoving party "must demonstrate the existence of specific facts . . . supported by 'sufficient probative evidence that would permit a finding in her favor on more than mere speculation, conjecture, or fantasy.'"[11] If the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[12]

Of course, the mere existence of a disputed fact will not bar summary judgment.[13] The dispute must be genuine, which means the evidence could cause a reasonable jury to decide the particular question of fact for either party.[14] And the disputed fact must be material, meaning the

---

[7]  *MacKintrush v. Pulaski Cty. Sheriff's Dep't*, 987 F.3d 767, 769 (8th Cir. 2021) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)); *see also* FED. R. CIV. P. 56(a).

[8]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[9]  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).

[10] *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).

[11] *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017) (quoting *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[12] *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[13] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[14] *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008); *Anderson*, 477 U.S. at 248.

resolution of the dispute will be outcome determinative under the controlling law.[15]  The Court will resolve all genuine issues of material fact in the non-moving party's favor.[16]  But the Court will not adopt a version of the facts that is blatantly contradicted by the record such that no rational juror could believe it.[17]

## **Background**

The events in question occurred in Blytheville, Arkansas, between 7:59 p.m. and 9:00 p.m. on September 29, 2018.  It was well after sunset and dark outside.  At approximately 7:59 p.m., Officer Driskill of the Blytheville Police Department responded to a call about an unknown man at 910 Hearn Street trying to "snatch the door open."[18]  Officer Driskill spoke with the resident of 910 Hearn Street, who explained that the encounter with the unknown man "was scary" and that the man's "eyes were big," as if the man "was on something."[19]  The resident described the man as a black male wearing a blue shirt.[20]  Officer Driskill searched around the outside of the house but did not find the man.

While Officer Driskill was still at 910 Hearn Street, dispatch received several calls concerning a man matching the same general description knocking on doors on Walnut Street.[21]  Officer Driskill left Hearn Street and made contact with a caller on Walnut Street.[22]  The caller

---

[15] *Holloway*, 884 F.2d at 366.

[16] *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[17] *Id.*

[18] Ex. 3 (Driskill Bodycam) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 54) beginning at 00:59:40.  It is not clear whether the resident said "snatch" or "smash."  Because this case is at the summary judgment stage, and genuinely disputed facts must be taken in the light most favorable to the Plaintiff, it is safest to assume the resident said "snatch," even though "smash" makes more sense in context.

[19] *Id.* beginning at 00:59:45.

[20] *Id.* beginning at 00:59:50.

[21] Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶ 3.

[22] *Id.* ¶ 4.

stated that a man was knocking on doors and asking for help.[23]  The caller directed Officer Driskill

toward 8th Street, which is where the man was last seen.[24]  En route, Officer Driskill received yet

another call from dispatch that seemed to involve the unknown male.[25]  This time, dispatch relayed

information about a man who was screaming for help behind a Baptist Church.[26]  There is a Baptist

Church on the corner of 8th Street and Walnut Street.[27]

Officer Driskill located a man fitting the given description at approximately 8:08 p.m. at

the southeast corner of Main Street and 7th Street.[28]  The man was 29-year-old Rayshawn Warren.

As it turns out, Mr. Warren suffered from a history of bipolar disorder.[29]  He also had a documented

history of drug use and meth abuse.[30]  Indeed, on the night in question, Mr. Warren tested positive

for amphetamines.[31]

Officer Driskill attempted to approach Mr. Warren saying, "what's going on, man," and

"come here."[32]  Mr. Warren responded "no."[33]  Officer Driskill told Mr. Warren two more times

---

[23] *Id.*

[24] *Id.*

[25] *Id.* ¶ 5.

[26] *Id.*

[27] GOOGLE EARTH, https://earth.google.com/web/search/walnut+street,+Blytheville,+AR/@35.9284429 (last visited July 26, 2021).  Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of this fact.  It is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

[28] Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶ 6; Ex. 3 (Driskill Bodycam) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 54) beginning at 01:08:40.

[29] Ex. 1 to Pl.'s Am. Resp. to Defs.' Mot. for Summ. J. (Doc. 51-1) at 1; Ex. 14 to Defs.' Statement of Material Facts (Doc. 27-14) at 2.  The Court has taken judicial notice of several facts, some of which provide evidence that Mr. Warren had a mental illness prior to the date of the arrest at issue in this litigation.  *See* Mot. for Order for Judicial Notice (Doc. 71); *see also* Text Order Granting Mot. for Order for Judicial Notice (Doc. 83).

[30] Ex. 1 to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51-1) at 3.

[31] Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶ 67; Ex. 14 to Defs.' Statement of Material Facts (Doc. 27-14) at 3; Ex. 13 to Defs.' Statement of Material Facts (Doc. 27-13) at 10.

[32] Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶ 7.

[33] *Id.*

to "come here."[34]  Once again, Mr. Warren responded "no" and then started running down Main

Street.[35]  Officer Driskill pursued Mr. Warren.[36]  At approximately 8:08 p.m., Officer Driskill

made physical contact with Mr. Warren.[37]  Roughly twenty-three minutes later, two other officers

determined that Mr. Warren did not have a pulse and began CPR.[38]  Mr. Warren never regained

consciousness; he spent the remainder of his life in a vegetative state until he died.  What happened

during those twenty-three minutes, and specifically whether Officer Driskill's conduct was

reasonable, are the primary questions underpinning Ms. Anderson's Complaint and Defendants'

Motion for Summary Judgment.

**Bodycam Videos**

The Court will walk step-by-step through the events that transpired during the arrest on the

night of September 29, 2018.[39]  For the most part, the facts will be derived from the bodycam

videos belonging to Officers Berumen, Krupin, and Driskill.[40]  When a fact is genuinely disputed,

the Court will adopt the version of the genuinely disputed fact that is most favorable to Plaintiff.

---

[34]  *Id.* ¶ 8.

[35]  *Id.*

[36]  Ex. 3 (Driskill Bodycam) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 54) beginning at 01:08:28.

[37]  *Id.* beginning at 01:08:46.

[38]  Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶¶ 50–52.  Officer Nathan Krupin, Officer Santos Berumen, and Officer Billy Hancock were also at the scene.  Those Officers are not named as Defendants in this case, as discussed above in note 6.  The same is true of Paramedic Anthony Johnson and Pafford Emergency Medical Services, Inc.  *See* Order Denying Mot. to Amend (Doc. 70).

[39]  *See* Ex. 2A (Bodycam Collage Video) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[40]  *See generally Scott v. Harris*, 550 U.S. 372, 381 (2007).  The timestamp is represented in the upper righthand corner of each respective bodycam feed.  The timestamp is in Zulu time.  For the sake of clarity, the Court has converted the Zulu time to Central time.  It is also worth noting that, although the videos in the bodycam collage are synchronized, the timestamps are different by fractions of a second.  Ex. 2B (Description of Work) to Defs.' Mot. for Summ. J. (Doc. 27-2) ("The time display on each of the cameras was slightly different, so I had to rely on the audio of two or more recordings to synchronize the footage together.").  Officer Berumen's timestamp is a fraction of a second behind Officer Driskill's timestamp.  And Officer Krupin's timestamp is a fraction of a second behind Officer Berumen's timestamp.  Officer Hancock's timestamp appears to be perfectly synchronized with Officer Krupin's timestamp.  Because of these slight discrepancies, the Court's "timing findings" are based on the Court's best approximations.

**The Attempted Armbar**

At 8:08:46 p.m., Officer Driskill made physical contact with Mr. Warren.[41]  The parties agree that during this brief initial altercation, Officer Driskill attempted to perform an armbar on Mr. Warren.[42]  Mr. Warren was facing Officer Driskill when contact was made.[43]  Mr. Warren put both of his arms out in front of his body and towards the chest or head of Officer Driskill.[44]  This was not done in a particularly violent manner.  Rather, Mr. Warren simply appeared to be creating a buffer between himself and Officer Driskill.

Officer Driskill and Mr. Warren scuffled for approximately 2 seconds before Mr. Warren prevailed in pushing Officer Driskill to the ground and breaking free of Officer Driskill's grasp.[45]  At 8:08:48 p.m., Mr. Warren's legs can be seen as Officer Driskill falls backwards to the ground.[46]  As Officer Driskill fell, he lost physical contact with Mr. Warren, and Mr. Warren again took flight.  At 8:08:50 p.m., Officer Driskill got back up and resumed pursuit.[47]

**The Takedown**

For the next eighteen seconds, Mr. Warren eluded Officer Driskill.[48]  Occasionally, Officer Driskill would instruct Mr. Warren to "come here" or to "get on the ground."[49]  Mr. Warren did not heed Officer Driskill's commands.  At 8:09:08 p.m., Officer Driskill again made physical

---

[41]  Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[42]  Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶ 10.

[43]  Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[44]  *Id.*

[45]  *Id.*

[46]  *Id.*

[47]  *Id.*

[48]  *Id.*

[49]  *Id.*

contact with Mr. Warren.[50]  This time, Officer Driskill threw Mr. Warren to the ground.[51]

Mr. Warren landed on his back on a patch of grass near to, but off of, a public road.  One second later, Officer Driskill mounted Mr. Warren, and the two lightly wrestled for hand control.[52]  At 8:09:15 p.m., Officer Driskill gained control of both of Mr. Warren's wrists.[53]  By 8:09:18 p.m., Officer Driskill had both of Mr. Warren's arms pinned to the ground near Mr. Warren's head.[54]  Officer Driskill was sitting on Mr. Warren's stomach, straddling him.[55]  Mr. Warren repeatedly yelled, "momma."[56]

From 8:09:18 p.m. until 8:10:28 p.m., Officer Driskill sat on Mr. Warren's stomach, straddling him and restraining his arms.[57]  Occasionally, Mr. Warren's arms can be seen tensing and flexing as he attempted to free himself from Officer Driskill's grasp.[58]  Officer Driskill instructed Mr. Warren to "stand down," "calm down," and "stop."[59]  Throughout this interaction, Mr. Warren repeatedly yelled for his mother and for help.  He also stated that he is a father of two and that he was "sketching."[60]  Mr. Warren also yelled unintelligible phrases.  Mr. Warren had what appears to be a white foam around his lips.

In the meantime, Officer Krupin arrived to the scene.[61]  At 8:10:11 p.m., Officer Krupin

---

[50]  *Id.*

[51]  *Id.*

[52]  *Id.*

[53]  *Id.*

[54]  *Id.*

[55]  *Id.*

[56]  *Id.*

[57]  *Id.*  Officer Driskill occasionally removed his grasp on Mr. Warren's right arm.

[58]  *Id.*

[59]  *Id.*

[60]  *Id.*

[61]  Ex. 2A (Bodycam Collage Video – Officer Driskill – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2). The blue lights of a police car can be seen reflecting off of Mr. Warren at approximately 8:09:59 p.m.  Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).  But Officer Krupin's camera is not on

approached Officer Driskill and Mr. Warren.[62]  At 8:10:20 p.m., Officer Krupin addressed Mr. Warren by name, saying "Rayshawn, chill the f**k out."[63]  At 8:10:24 p.m., Officer Krupin radioed Mr. Warren's full name to an unidentified party.[64]  At 8:10:28 p.m., Officer Krupin knelt down on the grass near the right side of Mr. Warren and made physical contact with Mr. Warren in an effort to assist Officer Driskill in restraining Mr. Warren.[65]

### The First Tasing

Officer Driskill was still holding Mr. Warren's arms against the ground.[66]  At 8:10:29 p.m., Officer Krupin placed his hand on Mr. Warren's right wrist and placed a taser on Mr. Warren's abdomen.[67]  Officer Krupin warned Mr. Warren that if Mr. Warren kept fighting, Officer Krupin was going to "tase the s**t" out of Mr. Warren.[68]  At 8:10:30 p.m., Mr. Warren said "okay" and Officer Krupin removed his hand from Mr. Warren's wrist.[69]

In the meantime, Officer Berumen arrived on the scene.[70]  At 8:10:34 p.m., Officer Berumen radioed Mr. Warren's full name to an unidentified party.[71]  At 8:10:40 p.m., Officer Driskill (still holding Mr. Warren's wrists) climbed off Mr. Warren and knelt on the grass next to

---

until approximately 8:10:11. Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[62] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] Ex. 2A (Bodycam Collage Video – Officer Driskill and Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[67] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[68] *Id.*

[69] *Id.*.

[70] Officer Berumen stepped out of his car at approximately 8:10:30 p.m.  Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[71] *Id.*

Mr. Warren's left hip.[72]   At 8:10:42 p.m., Mr. Warren lifted his legs to his stomach.[73]   Officer Krupin then repeatedly instructed Mr. Warren to roll over.[74]   Officer Krupin warned Mr. Warren three times that he would tase Mr. Warren if he did not roll over.[75]

At 8:10:45 p.m., Officer Berumen told Officers Driskill and Krupin to roll Mr. Warren over.[76]   Officers Driskill and Krupin attempted to roll Mr. Warren over.[77]   Mr. Warren sprawled backwards.[78]   Mr. Warren was kicking his legs and attempting to rip his arms from the Officers' grips.   At 8:10:47 p.m., Officer Krupin administered a five-second drive stun to Mr. Warren's abdomen.[79]   Mr. Warren appeared unaffected.[80]   The video reveals that Mr. Warren was able to grab Officer Krupin's taser and pull it away from his body.[81]   At 8:10:51 p.m., Officer Berumen grabbed Mr. Warren's right wrist.[82]   Officers Driskill, Krupin, and Berumen were all working together to control Mr. Warren.

### The Chokehold

Mr. Warren was still lying on his back because the Officers were having a difficult time getting him turned over.[83]   From that position, Mr. Warren sprawled backwards, kicked his legs

---

[72]  Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[73]  *Id.*

[74]  *Id.*

[75]  *Id.*

[76]  Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[77]  Ex. 2A (Bodycam Collage Video – Officer Berumen, Officer Krupin, and Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[78]  Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[79]  *Id.*

[80]  *Id.*

[81]  *Id.*

[82]  Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[83]  Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

into the air, and attempted to pull his arms to his body and out of the Officers' grasps.[84]   Officer Driskill was positioned to the left of Mr. Warren and worked to control Mr. Warren's left arm and left leg.[85]   But Officer Driskill quickly lost his grip on Mr. Warren's arm.[86]   Officer Berumen was positioned on Mr. Warren's right side and was attempting to restrain Mr. Warren's right arm.[87]   Officer Krupin had been near Mr. Warren's legs, but quickly repositioned himself near Mr. Warren's head.[88]

At 8:10:59 p.m., Mr. Warren put both hands over his head and curled into a ball on his left side.[89]   The Officers repeatedly instructed Mr. Warren to roll over, but to no avail.   At 8:11:04 p.m., Mr. Warren's voice became distorted.[90]   Viewing the facts in the light most favorable to Plaintiff, the Court concludes that this is the moment when Officer Krupin began to apply a chokehold (a vascular restraint) to Mr. Warren.

At 8:11:06 p.m., Officer Berumen's bodycam fell to the ground.[91]   About this same time, Officer Driskill's bodycam also came loose.[92]   As Officer Driskill adjusts his bodycam, it becomes apparent that he is no longer in physical contact with Mr. Warren.[93]   At 8:11:15 p.m., Officers Krupin and Berumen succeeded in rolling Mr. Warren onto his stomach.[94]   Officer Krupin told

---

[84]   Ex. 2A (Bodycam Collage Video – Officer Krupin, Officer Driskill, and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[85]   Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[86]   *Id.*

[87]   *Id.*

[88]   Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[89]   Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[90]   Ex. 2A (Bodycam Collage Video – Officer Krupin, Officer Driskill, and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[91]   Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[92]   Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[93]   *Id.*

[94]   Ex. 2A (Bodycam Collage Video – Officer Driskill and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

Officer Driskill to take hold of Mr. Warren's left arm.[95]   Officer Berumen was holding Mr. Warren's right arm behind Mr. Warren's back.[96]   At 8:11:31 p.m., Officer Krupin's bodycam fell to the ground and Officer Driskill took hold of Mr. Warren's left arm.[97]   At 8:11:33 p.m., Officer Krupin stated that he had Mr. Warren in a chokehold and assured Officers Driskill and Berumen that Mr. Warren wasn't going anywhere.[98]

From approximately 8:11:36 p.m. until approximately 8:12:05 p.m., Mr. Warren pulled his arm away from Officer Driskill and inward toward his own body.[99]   At least two of the Officers (it is unclear exactly which two) repeatedly instructed Mr. Warren to relax his arm.[100]   At 8:12:04 p.m., Officer Driskill addressed Mr. Warren by name and instructed him to relax his arm.[101]   At 8:12:06 p.m., Officer Krupin announced that Mr. Warren was unconscious.[102]   Officer Krupin then immediately released his chokehold and lifted himself off of Mr. Warren's back.[103]   In the light most favorable to Plaintiff, the chokehold lasted for approximately one minute and two seconds.

At 8:12:17 p.m., Officer Driskill successfully placed Mr. Warren's wrists in handcuffs behind Mr. Warren's back.[104]   By 8:12:20 p.m., all three Officers had broken physical contact with Mr. Warren, who was laying chest-down in the grass.[105]   Immediately after Officer Driskill

---

[95]   Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[96]   Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[97]   Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[98]   *Id.*

[99]   Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[100]   Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[101]   *Id.*

[102]   *Id.*

[103]   Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[104]   Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[105]   *Id.*

finished handcuffing Mr. Warren, Officer Driskill sat backwards and reached for his ankle.[106] Officer Berumen then placed his hands on Officer Driskill and asked Officer Driskill if he had been hurt.[107]   Officer Driskill stated that he twisted his ankle.[108]

At 8:12:34 p.m., Mr. Warren began to move again.[109]   At most, Mr. Warren was unconscious for approximately twenty-eight seconds.  At 8:12:47 p.m., Mr. Warren began to talk again.[110]  His talking quickly progressed to yelling.

### The Leg Slam, Second Tasing, and Leg Shackles

At 8:12:51 p.m., Officer Driskill instructed Mr. Warren to "calm down" and "relax."[111] For the next few seconds, Mr. Warren squirmed on the ground and continued to yell.[112]   Officer Berumen was standing close to Mr. Warren.  At one point, it appears as though Officer Berumen was standing over Mr. Warren or on Mr. Warren's right arm to hold Mr. Warren in place.[113]   At 8:13:21 p.m., Officer Berumen bent down, grabbed Mr. Warren by the arm, and slid Mr. Warren a few feet away from the concrete sidewalk and further onto the grass.[114]   Mr. Warren continued to writhe, wriggle, and yell.

At 8:13:29 p.m., Mr. Warren began kicking his legs into the air and near the Officers who

---

[106] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] Ex. 2A (Bodycam Collage Video – Officer Krupin, Officer Driskill, and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[111] *Id.*

[112] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[113] Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[114] Ex. 2A (Bodycam Collage Video – Officer Driskill and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

were standing close by.[115]   At 8:13:34 p.m., Officer Driskill reinitiated physical contact with Mr.

Warren.[116]  Officer Driskill knelt down beside Mr. Warren, placed his left hand on Mr. Warren,

and instructed Mr. Warren to calm down.  At 8:13:37 p.m., Officer Berumen warned Officer

Driskill not to allow Mr. Warren to kick Officer Driskill.[117]  Only moments later, at 8:13:41 p.m.,

Mr. Warren kicked his legs again.  It appears that Mr. Warren's right foot contacted Officer

Driskill's left shoulder and the left side of Officer Driskill's head or neck.[118]

Officer Driskill immediately reacted to the kick.[119]   At 8:13:44 p.m., Officer Driskill

grabbed Mr. Warren's right leg and slammed it to the ground, using the force of Officer Driskill's

own body.  Officer Driskill's bodycam fell off in the process.[120]  Officer Berumen then joined the

struggle.[121]  At 8:13:47 p.m., Officer Driskill can be seen holding Mr. Warren's right leg as Officer

Berumen simultaneously holds Mr. Warren's right arm.[122]  Officer Berumen instructed Officer

Driskill to let go of Mr. Warren's leg, and Officer Driskill let go.[123]  Officer Driskill then clambered

off of Mr. Warren and Officer Krupin took Officer Driskill's place.[124]

At 8:13:50 p.m., Officer Krupin reminded Officers Berumen and Driskill that, despite the

fact that Mr. Warren was "kicking and s**t," Mr. Warren was now in their custody.[125]  By this

---

[115] Ex. 2A (Bodycam Collage Video – Officer Krupin, Officer Driskill, and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[116] *Id.*

[117] Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[118] Ex. 2A (Bodycam Collage Video – Officer Krupin, Officer Driskill, and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[119] *Id.*

[120] Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[121] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[122] *Id.*

[123] Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[124] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[125] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

time, there is no indication that Officer Driskill was still physically engaged with Mr. Warren.  At 8:13:57 p.m., it is apparent that Officer Driskill was standing a few feet away from Mr. Warren.[126] At 8:13:58 p.m., Officer Driskill's bodycam went dark.  Officer Krupin's bodycam and Officer Berumen's bodycam both remained on.  Nothing in their video feeds suggest that Officer Driskill returned to the struggle.[127]

At 8:13:59 p.m., Officer Krupin warned Mr. Warren that if Mr. Warren kept moving, he was going to get tased.[128]  Officer Krupin placed his taser (in drive-stun mode) against Mr. Warren's right leg.[129]  At 8:14:04 p.m., Officer Krupin administered a five-second drive stun to Mr. Warren's leg.[130]  At the end of the taser cycle, Mr. Warren rolled onto his stomach and Officer Berumen placed his weight on Mr. Warren's back.[131]  Mr. Warren continued to lightly kick his legs.[132]  At 8:14:44 p.m., Officer Krupin placed Mr. Warren's ankles into handcuffs.[133]  Officer Krupin then stood up and placed his foot on the handcuff chain between Mr. Warren's ankles.[134]

At 8:14:59 p.m., Officer Driskill can be seen on the left side of Officer Krupin's video feed

---

[126] Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[127] At approximately 8:14:03 p.m., a foot can be momentarily seen in the upper righthand side of Officer Berumen's video feed.  Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).  The Court finds that this was Officer Driskill's foot, as Officers Berumen and Krupin are laying on the ground struggling with Mr. Warren.  At 8:14:18 p.m., Officer Berumen asks Officer Driskill if he has any leg shackles.  Officer Driskill's response appears to come from somewhere behind Officers Berumen and Krupin.  Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).  Officer Driskill is never seen assisting Officers Berumen and Krupin in either of their videos.  By 8:14:52 p.m., the shadows verify that Officer Driskill is not near the other Officers and Mr. Warren.  Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).  At 8:14:59 p.m., Officer Driskill can be seen on the left side of Officer Krupin's screen sitting down in the grass a few feet to the left of Mr. Warren and behind Officer Berumen.  Id.  At approximately 8:15:40 p.m., Officer Driskill can be seen standing against one of the police cruisers in the background.  Id.

[128] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[129] Id.

[130] Id.

[131] Id.

[132] Id.

[133] Id.

[134] Id.

sitting down in the grass a few feet to the left of Mr. Warren and behind Officer Berumen.[135] Officers Krupin and Berumen remarked that Mr. Warren was "tripping on something," but that Mr. Warren did not appear to be suffering from an overdose.[136]   Shortly thereafter, Officer Berumen rose to his feet, placed his hand on Mr. Warren's back for a few seconds, and then shifted to placing his right foot on Mr. Warren's back.[137]

At 8:15:40 p.m., Officer Driskill came back into view.[138]   He was standing against one of the police cruisers well away from Mr. Warren.  At 8:16:14 p.m., Officer Berumen asked Officer Driskill if Officer Driskill needed to go to the hospital.[139]  At 8:17:14 p.m., Officer Krupin stated that Mr. Warren must have "got some bad meth."[140]   At 8:17:22 p.m., Officer Driskill turned his bodycam back on.[141]   He was still standing next to the police cruiser a good distance away from Mr. Warren.  At 8:17:54 p.m., Officer Krupin reported to EMS that Officer Driskill "messed his ankle up fighting with the suspect."[142]  Officers Berumen, Driskill, and Krupin sprayed themselves with bug spray.  They did not spray Mr. Warren.

At 8:18:07 p.m., Officer Driskill sat down on the ground a few feet away from Mr. Warren.[143]  Mr. Warren was still muttering unintelligibly.  At 8:18:11 p.m., Officer Berumen removed his foot from Mr. Warren's back.[144]  At 8:18:20 p.m., Mr. Warren can be seen sitting

---

[135] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[136] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[137] *Id.*

[138] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[139] Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[140] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[141] Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[142] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[143] Ex. 2A (Bodycam Collage Video – Officer Driskill and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[144] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

upright on the ground between Officers Driskill, Berumen, and Krupin.[145]   None of the Officers were holding him down.   At 8:18:28 p.m., Mr. Warren rocked forward, as if he were attempting to stand up, and then asked Officer Krupin if he could stand up for a minute.[146]   Officer Krupin said no and told Mr. Warren to stay seated.[147]   Mr. Warren then repeatedly tried to stand.[148]   At 8:18:44 p.m., Officer Driskill verbally urged Mr. Warren to sit with him.[149]   By approximately 8:21:07 p.m., EMS had arrived on the scene.[150]

### Additional Excessive Force Allegations

The last time Officer Driskill was physically engaged with Mr. Warren was approximately 8:13:51 p.m., when Officer Driskill let go of Mr. Warren's leg right before Officer Krupin took control and administered the second drive-stun tasing.   The Court has already detailed some of what happened after Officer Driskill ceased contact with Mr. Warren.   In particular, Officer Krupin tased Mr. Warren in drive-stun mode in the leg, and Officers Krupin and Berumen handcuffed Mr. Warren's legs.

Plaintiff also notes that, after EMS arrived, the paramedic became aggressive with Mr. Warren.[151]   At 8:24:28 p.m., Mr. Warren began kicking his legs as Officers Krupin and Berumen and the paramedic attempted to prepare Mr. Warren for transfer.[152]   After Mr. Warren began

---

[145] Ex. 2A (Bodycam Collage Video – Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[146] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[147] *Id.*

[148] *Id.*

[149] Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[150] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[151] The only paramedic on the scene was Mr. Anthony Johnson.  His partner that night was Trevor Orr, an EMT.  *See* Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶ 34.

[152] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

kicking, the paramedic stated that Mr. Warren was about to "kick the wrong person."[153]  Mr. Warren continued to kick, and the paramedic attempted "pain compliance" tactics to subdue Mr. Warren.[154]  Specifically, at 8:25:04 p.m., the paramedic began kneeing Mr. Warren in the side.[155]  Mr. Warren's conduct did not abate despite the paramedic's force.

At 8:25:58 p.m., the paramedic began to hog-tie Mr. Warren.[156]  At 8:26:09 p.m., Officer Krupin informed the paramedic that he could not hog-tie Mr. Warren.[157]  At 8:27:03 p.m., Mr. Warren yelled one last time and then went silent.[158]  Once again, Officer Driskill had no contact with Mr. Warren during this interaction.  Indeed, Officer Driskill had left the scene to retrieve his vehicle from where he had originally parked it when the foot chase with Mr. Warren first began.[159]

At 8:28:15 p.m., the paramedic rolled Mr. Warren onto Mr. Warren's back.[160]  At 8:28:21 p.m., the paramedic stated, "hold your breath, that's good."[161]  At approximately 8:30:00 p.m., all of the Officers' bodycams went dark.[162]  A little over a minute later, at 8:31:04 p.m., Officer Krupin's video feed returned.[163]  Officer Krupin was taking Mr. Warren's pulse.  Officer Krupin

---

[153] *Id.*

[154] *Id.*

[155] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[156] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[157] *Id.*

[158] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[159] At approximately 8:26:25 p.m., a vehicle can be seen pulling in behind the ambulance in the background of Officer Krupin's video feed. Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2). Someone asked whether the car belonged to a state trooper, to which Officer Krupin responded, "no, that's Driskill." Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2). At approximately 8:26:55 p.m., Officer Driskill can be seen getting out of his vehicle and walking towards Officer Krupin. Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2). At 8:27:09 p.m., as Officer Driskill is walking back towards Officer Krupin, his body camera turns back on and it becomes all the more apparent that it was Officer Driskill in the vehicle. Ex. 2A (Bodycam Collage Video – Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[160] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Driskill) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[161] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[162] Ex. 2A (Bodycam Collage Video) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[163] Ex. 2A (Bodycam Collage Video – Officer Krupin) to Defs.' Mot. for Summ. J. (Doc. 27-2).

began CPR at 8:31:49 p.m.[164]   At 8:32:19 p.m., Officer Driskill bent down and began assisting

Officers Krupin and Berumen in removing the handcuffs from Mr. Warren.[165]   This was the first

time that Officer Driskill physically contacted Mr. Warren in over nineteen minutes.   Shortly

thereafter, EMS took Mr. Warren into its custody and transported Mr. Warren to the hospital.

As stated above, Mr. Warren never regained consciousness; he spent the remainder of his

life in a vegetative state until he died.   Ms. Anderson maintains that Defendants' conduct resulted

in Mr. Warren suffering a crushed trachea, which she alleges ultimately caused Mr. Warren's

death.[166]   She cites little to no evidence supporting this contention.[167]   Defendants assert that Mr.

Warren died from cardiac arrest (which they say was caused by the amphetamines in Mr. Warren's

system on the night of the arrest).[168]   Defendants' theory has more support in the record,[169] but it

too is not without holes.[170]   Ultimately, however, the Court need not decide this issue.   Although

the dispute here is genuine, its outcome is not dispositive for reasons described in the Court's

---

[164] Ex. 2A (Bodycam Collage Video – Officer Krupin and Officer Berumen) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[165] Ex. 2A (Bodycam Collage Video – Officer Hancock) to Defs.' Mot. for Summ. J. (Doc. 27-2).

[166] Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 43) at 13.

[167] Ms. Anderson generally alludes to reports from the St. Bernards Medical Center indicating that Mr. Warren had a crushed trachea.  The only St. Bernards report contained in the record mentions only that Mr. Warren's physical exam, on October 26, 2018, revealed that Mr. Warren's neck was supple and his trachea was midline.  Ex. 14 to Defs.' Statement of Material Facts (Doc. 27-14) at 5–8.  Dr. Stephen Pirtle, the doctor that first treated Mr. Warren after the incident, testified that Mr. Warren had a stable airway and that he did not diagnose Mr. Warren with a crushed trachea.  Ex. 13 to Defs.' Statement of Material Facts (Doc. 27-14) at 8.

[168] Defs.' Br. in Supp. of Defs.'Mot. for Summ. J. (Doc. 26) at 8.

[169] Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51-3) at 2 (EMS report noting Mr. Warren's drug habit and noting a secondary impression of drug abuse on the night in question); Ex. 1 to Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 55-1) at 6–8 (paramedic Anthony Johnson explaining that Mr. Warren was in defib when Mr. Johnson hooked Mr. Warren up to the cardiac monitor); Ex. 13 to Defs.' Statement of Material Facts (Doc. 27-14) at 10 (Dr. Pirtle noting that Mr. Warren tested positive for marijuana and amphetamines when he first arrived at the hospital); Ex. 14 to Defs.' Statement of Material Facts (Doc. 27-14) at 3 (St. Bernards discharge papers noting that Mr. Warren suffered from acute cardiac arrest, which was "probably associated with substance abuse").

[170] Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 51-3) at 3 (EMS report indicating no cardiac arrest); Ex. 13 to Defs.' Statement of Material Facts (Doc. 27-14) at 12 (Dr. Pirtle stating that there was apparently no cardiac disorder shown on the EKG when Mr. Warren arrived to the hospital).  *But see* Ex. 1 to Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 55-1) at 7–8 (paramedic Anthony Johnson explaining that he believed Mr. Warren was in cardiac arrest despite indicating in the report that Mr. Warren was not in cardiac arrest).

analysis below.

## Discussion

Ms. Anderson, as Guardian of the Person and Estate of Rayshawn Warren, sued Officer Driskill in his individual and official capacities for allegedly violating Mr. Warren's constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.  She also sued Officer Driskill for state law claims of assault and battery.  Ms. Anderson sued Chief Thompson in his individual and official capacities for allegedly violating Mr. Warren's constitutional rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments because Chief Thompson allegedly failed to properly train and supervise "Defendant Police Officer(s) . . . ."[171]  (Aside from Chief Thompson himself, Officer Driskill is the only "Defendant Police Officer" in this case.) Finally, Ms. Anderson asserts that the City of Blytheville violated Mr. Warren's constitutional rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments by failing to train and supervise its officers, and by permitting the use of unconstitutional customs and policies.

## I.      Officer Driskill – Excessive Force Under the Fourth Amendment

The primary question in this case is whether *Officer Driskill* used excessive force in apprehending Mr. Warren.  "Excessive force claims under the Constitution are governed by the Fourth Amendment's right of the people to be secure against unreasonable seizures."[172] "Assessing the reasonableness of a seizure 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"[173]

---

[171] Pl.'s Compl. (Doc. 2) ¶ 28.

[172] *Liggins v. Cohen*, 971 F.3d 798, 800 (8th Cir. 2020) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

[173] *Shelton v. Stevens*, 964 F.3d 747, 751–52 (8th Cir. 2020) (internal quotations omitted) (quoting *Graham*, 490 U.S.

Reasonableness must be determined from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[174]   The Court considers the particular circumstances of the case, including (but not limited to) "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[175]   "The degree of a plaintiff's injury is also relevant 'insofar as it tends to show the amount and type of force used.'"[176]   And, as Plaintiff argues and Defendants acknowledge, a suspect's mental illness is a proper factor to be considered in the mix to the extent the officer knows about the illness.

This case also implicates qualified immunity.   As a general rule, qualified immunity protects police officers from liability for civil damages so long as their conduct "does not violate clearly established constitutional or statutory rights of which a reasonable person would have known."[177]   To determine whether qualified immunity applies, the Court asks two questions: "(1) whether the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) whether the right was clearly established at the time of the deprivation."[178]

If the Court determines that Officer Driskill used reasonable force under the circumstances, then the analysis ends because there was no deprivation of a constitutional or statutory right.   On

---

at 396).

[174] *Id.* at 752 (quoting *Graham*, 490 U.S. at 396).

[175] *Id.* (quoting *Graham*, 490 U.S. at 396).  The Court may also consider "any effort made by the officer to temper or to limit the amount of force[,]" "the severity of the security problem at issue" (as opposed to the severity of the underlying crime), and "the threat reasonably perceived by the officer . . . ."  *Lombardo v. City of St. Louis, Mo.*, 141 S. Ct. 2239, 2241 (2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).  Again, this is not an exhaustive list of factors appropriately considered.

[176] *Stevens*, 964 F.3d at 752 (quoting *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011)).

[177] *MacKintrush*, 987 F.3d at 770 (quoting *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019)).

[178] *Id.* (quoting *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017)).

the other hand, if the Court determines that officer Driskill did *not* use reasonable force under the circumstances, the Court must then determine whether the right that Officer Driskill violated "was clearly established at the time of the deprivation."[179]  It is important to note that "clearly established law" is not to be defined at "a high level of generality."[180]  For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate."[181]  Said differently, "[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[182]  "Even where an officer's action is deemed unreasonable under the Fourth Amendment, he is entitled to qualified immunity if a reasonable officer could have believed, mistakenly, that the use of force was permissible—if he was 'reasonably unreasonable.'"[183]

That is not to say that a law is clearly established only if there is a "case directly on point."[184]  Nor is it to say that the exact conduct must have been deemed unconstitutional before the incident.  But it does mean that, "in the light of preexisting law[,] the unlawfulness must be apparent."[185]

### A. The Attempted Armbar

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[186]  When Officer Driskill

---

[179] *Id.* (quoting *Ehlers*, 846 F.3d at 1008).

[180] *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

[181] *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

[182] *Shelton*, 964 F.3d at 753 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[183] *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 643 (1987)).

[184] *Ashcroft*, 563 U.S. at 742.

[185] *Langford v. Norris*, 614 F.3d 445, 461 (8th Cir. 2010) (quoting *Anderson*, 483 U.S. at 640).

[186] Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 43) at 3 (quoting *Graham*, 490 U.S. at 396).

initially approached and questioned Mr. Warren, a seizure had not yet occurred.[187] But the moment Officer Driskill applied physical force to the body of Mr. Warren, a seizure occurred.[188] Ms. Anderson contends that the force used to effectuate the seizure was objectively unreasonable.[189] In particular, she asserts that Officer Driskill's attempt to use an armbar constituted an excessive use of force.[190]

Ms. Anderson's assertion is hard to reconcile with *Kohorst v. Smith*, a case in which the Eighth Circuit held that a *successful* armbar takedown did not rise to the level of a constitutional violation where the plaintiff "at minimum appeared to be resisting and was not complying with commands."[191] The facts in *Kohorst* are not on all fours with facts of the case at bar, but they are close enough.[192]

At first blush, the severity of Mr. Warren's suspected crime appears relatively minor. Mr. Warren was knocking on doors, walking through yards, and screaming. At worst, Mr. Warren was a suspected misdemeanant.[193] But a closer look from the perspective of Officer Driskill suggests

---

[187] *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force . . . or, where that is absent, *submission* to the assertion of authority.") (emphasis added).

[188] *Torres v. Madrid*, 141 S. Ct. 989, 994 (2021). Even though the initial attempt did not ultimately succeed in subduing Mr. Warren, a Fourth Amendment seizure still occurred. *See id.*

[189] Pl.'s Compl. (Doc. 2) ¶¶ 17, 27. Ms. Anderson also vaguely quibbles with the propriety of the seizure itself. Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 43) at 6. But only indirectly. And she does not cite any law or develop any arguments contesting the propriety of the seizure itself.

[190] Pl.'s Compl. (Doc. 2) ¶¶ 13, 27.

[191] *Kohorst*, 968 F.3d at 877.

[192] *See also Ehlers*, 846 F.3d at 1010–11 (affirming the district court's grant of qualified immunity where the police used a spin takedown and taser on a nonviolent misdemeanant who defied police orders); *McVay ex rel. Est. of McVay v. Sisters of Mercy Health Sys.*, 399 F.3d 904, 908 (8th Cir. 2005) (finding no excessive force where a police officer tackled a man who appeared "disoriented and [was] exhibiting signs of lacking mental control" because the man's running towards a glass door "posed a threat at least to himself").

[193] Mr. Warren was ultimately charged with public intoxication, fleeing on foot, disorderly conduct, and resisting arrest. Ex. 4 to Defs.' Statement of Material Facts (Doc. 27-4) at 2; Ex. 16 to Defs.' Statement of Material Facts (Doc. 27-16) at 1–4. His initial charges (before resisting arrest) were relatively minor. But despite Mr. Warren being only a suspected misdemeanant when Officer Driskill first made contact, Officer Driskill was "not required to let [Mr. Warren] run free." *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) ("Although the charges were limited to misdemeanors, the officers executing the warrant were not required to let Barnes run free."). In fact, the Eighth Circuit has held that "officers may seize a person 'in order to ensure the safety of the public and/or

there were legitimate reasons for heightened concern.  Indeed, multiple residents in the area had

called 911 to report the disturbance.  Mr. Warren's conduct was brazen; he gave no regard to whom

he disturbed or whether he was caught.  And he was on the move.  Additionally, the first resident

Officer Driskill spoke with stated that Mr. Warren had tried to "snatch the door open,"[194] that it

"was scary," and that the man's "eyes were big," as if the man "was on something."[195]

Initially, Officer Driskill simply called out to Mr. Warren.  But when Mr. Warren abruptly

began to run down a public road in the dark, Officer Driskill was forced to react.  Throughout this

brief chase, Officer Driskill (who was alone at this point) repeatedly instructed Mr. Warren to stop

running, but to no avail.  When Officer Driskill finally caught Mr. Warren, he attempted an armbar

takedown.  In light of Mr. Warren's suspected conduct, his refusal to comply with repeated verbal

demands, and his flight, the attempted armbar takedown was objectively reasonable.  Moreover,

the attempted armbar was just that, an attempted (unsuccessful) armbar.  And there is no indication

in the record that Mr. Warren suffered any injury whatsoever from this initial, two-second seizure

and attempted armbar.[196]

Ms. Anderson alleges that Officer Driskill "knew that Rayshawn Warren had a clinical

diagnosis of bipolar disorder" and that Mr. Warren was entitled to certain accommodations as a

result of his mental disorder.[197]  The record reveals that Officer Driskill had arrested Mr. Warren

---

the individual, regardless of any suspected criminal activity.'"  *Cravener v. Shuster*, 885 F.3d 1135, 1140 (8th Cir. 2018) (quoting *Winters v. Adams*, 254 F.3d 758, 763–65 (8th Cir. 2001)).

[194] Ex. 3 (Driskill Bodycam) to Pl's Resp. to Defs.' Mot. for Summ. J. (Doc. 54) beginning at 00:59:40.

[195] *Id.* beginning at 00:59:45.

[196] "The fleeting nature of some seizures by force undoubtedly may inform what damages a civil plaintiff may recover . . . ."  *Torres*, 141 S. Ct. at 999.  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (internal citation omitted).  The only specific injury that Ms. Anderson alleges is a crushed trachea.  Ms. Anderson did not put forth any evidence indicating that Mr. Warren suffered a crushed trachea as a result of the attempted armbar.  *See, e.g.,* Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶¶ 61–72.

[197] Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 43) at 5.

on one previous occasion for criminal trespass during the early morning hours of June 28, 2017.[198]

According to an incident report, Mr. Warren "admitted that he knew he wasn't suppose[d] to be

on the property," and Mr. Warren admitted to using meth "two days ago."[199]  The report also

indicated that Mr. Warren "was restless and couldn't stop talking," and that Mr. Warren "began

having a conversation with himself."[200]  But nothing in the report or the rest of the record indicates

that Officer Driskill knew that Mr. Warren suffered from bipolar disorder.[201]  And there is no

indication that Officer Driskill recognized Mr. Warren during the initial and brief physical

interaction at issue today.[202]

    Even if Officer Driskill did know that Mr. Warren had a mental illness, knowledge of a

person's disability is but one of the circumstances considered in determining whether the use of

force was reasonable.[203]  And the Eighth Circuit has been clear in holding that knowledge of a

---

[198] Ex. 3 to Defs.' Affidavit re Motion for Leave to File Supp. Record (Doc. 67-3) at 3.

[199] *Id.*

[200] *Id.*

[201] The Court took judicial notice of, among other things, a petition Mr. Warren's aunt "filed on August 24, 2015 for the Involuntary Admission of the Plaintiff's son, Rayshawn Warren, due to mental illness in case number 47B-PR2015-114." Mot. for Judicial Notice (Doc. 71) ¶ 1.a.  Ms. Anderson asserts that knowledge of Mr. Warren's mental illness can be imputed to Officer Driskill under the theory of constructive or "collective knowledge."  The "collective knowledge" theory requires "communication" among members of a team or investigation.  *See, e.g.*, *Wood v. Wooten*, 986 F.3d 1079, 1081 (8th Cir. 2021) (stating that officers may rely on the "collective knowledge of all law enforcement officers involved in the investigation … if there is some degree of communication") (quoting *United States v. Edwards*, 891 F.3d 708, 711–12 (8th Cir. 2018)); *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) ("When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop.") (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007)).  Ms. Anderson has not provided any evidence that knowledge of Mr. Warren's admission to a mental hospital in 2015 had any involvement in the instant arrest or otherwise communicated information about Mr. Warren to Officer Driskill.  Although the Court takes judicial notice of the public record, the information is not imputed to Officer Driskill.

[202] *McKenney*, 635 F.3d at 360 ("Accepting, however, that the mental capacity of the citizen bears on the reasonableness of the officer's conduct, the record does not support a finding that these officers knew that Barnes was mentally retarded. That Barnes did not say anything in response to Harrison's orders or ask the officers any questions did not place the officers on notice of a mental disability.").

[203] *Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020) ("Though Kong appeared high on meth, the cases establish that mental illness or intoxication does not reduce the immediate and significant threat a suspect poses."); *Frederick v. Motsinger*, 873 F.3d 641, 647 (8th Cir. 2017) ("Even if she was suffering from mental illness or other impairment, the relevant inquiry is whether she posed a threat, not what prompted her

disability cannot foreclose officers from protecting themselves or the general public when faced with a threat.[204]   Likewise, knowledge of mental illness cannot foreclose an officer from using some degree of force to stop a fleeing suspect who refuses to listen to verbal commands.   Based on all of the circumstances, and from "the perspective of a reasonable officer on the scene," the Court finds that the force applied during this initial seizure was objectively reasonable.   Ms. Anderson has failed to identify a genuine question of material fact that would permit a rational juror to rule in her favor with respect to the attempted armbar.   Because the force used was objectively reasonable, Ms. Anderson cannot demonstrate the deprivation of a constitutional or statutory right.   Officer Driskill is therefore entitled to qualified immunity with respect to the initial seizure and the corresponding force employed.[205]

### B.  The Takedown

While much of the armbar analysis applies to the takedown, a separate analysis must still be conducted.   "[T]he Fourth Amendment does not recognize any 'continuing arrest during the period of fugitivity.'"[206]   "A seizure by force—absent submission—lasts only as long as the application of force."[207]   When Mr. Warren broke free of Officer Driskill's initial grasp, the first seizure ended.   When Officer Driskill made physical contact with Mr. Warren for a second time,

---

threatening conduct."); *Est. of Morgan v. Cook*, 686 F.3d 494, 498 (8th Cir. 2012) ("But Morgan's intoxication does not alter our finding that Cook's use of deadly force was objectively reasonable."); *Hayek v. City of St. Paul*, 488 F.3d 1049, 1055 (8th Cir. 2007) ("Even if William were mentally ill, and the officers knew it, William's mental state does not change the fact he posed a deadly threat to the officers."); *Hassan v. City of Minneapolis, Minn.*, 489 F.3d 914, 919 (8th Cir. 2007) ("However, even if Jeilani were mentally ill, Jeilani's mental state does not change the fact he posed a deadly threat to the officers and the public."); *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) (quoting *Bates ex rel. Johns v. Chesterfield County, Va.*, 216 F.3d 367, 372 (4th Cir. 2000) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual.")).

[204] *See supra* note 203.

[205] *MacKintrush*, 987 F.3d at 770 (quoting *Ehlers*, 846 F.3d at 1008).

[206] *Torres*, 141 S. Ct. at 999 (quoting *Hodari D.*, 499 U.S. at 625).

[207] *Id.*

a second, new seizure began.

The biggest change from the first seizure analysis to the second seizure analysis is Mr. Warren's erratic conduct during the first seizure and his subsequent evasiveness.[208]   At first contact, Mr. Warren was a suspected misdemeanant, albeit a concerning suspected misdemeanant. But when Mr. Warren resisted arrest by fighting with Officer Driskill, pushing him to the ground, and running away, the threat Mr. Warren posed to Officer Driskill and the community evolved. He had now committed additional crimes (resisting arrest and fleeing from an officer) witnessed by Officer Driskill—crimes that showed a willingness to resist police with force.[209]

Another change from the first seizure to the second seizure is the type and degree of force applied.  This time, Officer Driskill (who was still alone at this point) knocked Mr. Warren onto Mr. Warren's back.  Officer Driskill then mounted Mr. Warren and held his hands down for a little over one minute.  There is no indication in the record that Mr. Warren suffered any injury whatsoever from this takedown.[210]   Nor is there any indication that Mr. Warren was harmed by Officer Driskill's conduct in pinning Mr. Warren to the ground.  Most importantly, Mr. Warren

---

[208] The Eighth Circuit has repeatedly recognized that police officers are often faced with making "split-second judgments" in "'tense, uncertain, and rapidly *evolving*' circumstances."  *See, e.g.*, *Shelton*, 964 F.3d at 752 (emphasis added) (quoting *Graham*, 490 U.S. at 396).  As the situation escalates, the officer's use of corresponding force may escalate with it.  *Bahl v. Cty. of Ramsey*, 695 F.3d 778, 785 (8th Cir. 2012) (noting that even routine traffic stops can escalate out of control and that officers must "respond fluidly to changing situations and individuals they encounter") (quoting *Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2008), *abrogated on other grounds* by *Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015)).  Conversely, when a situation de-escalates, "a reasonable officer is not permitted to ignore changing circumstances."  *Masters v. City of Indep., Mo.*, 998 F.3d 827, 836 (8th Cir. 2021) (quoting *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018)).

[209] *See* Ark. Code Ann. § 5-54-103.  Indeed, on September 29, 2018, Officer Driskill filed an incident report with the Blytheville Police Department characterizing Mr. Warren as committing a resisting arrest crime.  Ex. 1 to Defs.' Statement of Material Facts (Doc. 27-1) at 1; *see also* Ex. 16 to Defs.' Statement of Material Facts (Doc. 27-16).

[210] "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation omitted).  "A de minimis use of force is insufficient to support a claim, and it may well be that most plaintiffs showing only de minimis injury can show only a corresponding de minimis use of force." *Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019) (quoting *Chambers*, 641 F.3d at 906).  As noted earlier, the only specific injury that Ms. Anderson alleges is a crushed trachea.  Ms. Anderson did not put forth any evidence indicating that Mr. Warren suffered a crushed trachea as a result of the takedown. *See, e.g.*, Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶¶ 61–72.

had been actively fleeing from Officer Driskill and continued to struggle to break free of Officer Driskill's grip.

When Officer Krupin arrived on the scene, Officer Krupin identified Mr. Warren by name. Given that Officer Driskill arrested Mr. Warren a little over a year earlier, this may have triggered Officer Driskill's memory of Mr. Warren.  The record does not indicate either way.  But even assuming it did spark a connection, there is still nothing in the record indicating that Officer Driskill knew of Mr. Warren's history of mental illness.  And as stated above, even if he did know, mental illness is just one factor to consider in determining what constitutes reasonable force. Officer Driskill was still justified in using some amount of force to tackle and restrain a fleeing and resistant suspect and to control the situation near a public road after dark.[211]

Considering all of the facts previously identified, as well as the additional developments just discussed, the Court finds that the force applied to this point during the second seizure was objectively reasonable.  Ms. Anderson has failed to identify a genuine question of material fact that would permit a rational juror to rule in her favor with respect to the takedown.  Because the force used was objectively reasonable, Ms. Anderson cannot demonstrate the deprivation of a constitutional or statutory right.  Officer Driskill is therefore entitled to qualified immunity with respect to the takedown.

### C.  The First Tasing

Defendants urge the Court to stop its analysis of Officer Driskill's conduct at this juncture. Defendants contend that the Complaint only alleges facts pertaining to Officer Driskill's involvement in the attempted armbar and the takedown.[212]  In response, Ms. Anderson asserts that

---

[211] *See, e.g.*, *Sok Kong*, 960 F.3d at 993.

[212] Defs.' Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 26) at 5–8; Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for

the Complaint's language is broad enough to encompass all of Officer Driskill's involvement in Mr. Warren's arrest, even where his involvement is in a supporting role.[213]  Defendants have a pretty strong point.  There is no question that the thrust of the Complaint is about the attempted armbar restraint.  But, to be safe, let's assume arguendo that the Complaint is broad enough to encompass all of Officer Driskill's physical interactions with Mr. Warren during the arrest.[214]

This assumption does not open the floodgates for Plaintiff nor does it allow Plaintiff to sidestep the Court's prior denial of Plaintiff's Motion to Amend.  The Eighth Circuit has been clear that "[a]n officer may be held liable only for his or her own use of excessive force."[215]  Indeed, "[l]iability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed."[216]  "Section 1983 does not sanction tort by association,"[217] and the Court must therefore consider "the actions of *each* officer 'from the perspective of a reasonable officer on the scene . . . .'"[218]  Thus, Officer Driskill's liability is confined to his personal conduct. He can't be tagged with the conduct of the other Officers.

It is true that the Eight Circuit recognizes that an officer can be liable for failing to intervene

---

Summ. J. (Doc 55) at 1–6.

[213] Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 43) at 1–2, 15.

[214] Under Federal Rule of Civil Procedure 8(d), "[e]ach allegation" in a pleading "must be simple, concise, and direct." And the Court must construe the pleadings "so as to do justice."  FED. R. CIV. P. 8(e).  The Complaint generally alleges that Officer Driskill deprived Mr. Warren of his constitutional rights by "using a degree of force that was unreasonable."  Pl.'s Compl. (Doc. 2) ¶ 27; Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 43) at 1–2, 15.  The Complaint also broadly states that "the force used to restrain Rayshawn Warren was extremely excessive."  Pl.'s Compl. (Doc. 2) ¶ 17.  And the Complaint notes that the alleged excessive force can be seen on "at least three (3) officer body camera[s]" that were recording during the arrest.  *Id.* ¶ 18.  Considering Federal Rule of Civil Procedure 8(e), it's not entirely unreasonable to argue that the Complaint fairly includes all of Officer Driskill's physical interactions with Mr. Warren and sufficiently placed Defendants on notice of the same.

[215] *Smith v. Kansas City, Mo. Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009) (citing *Hayek*, 488 F.3d at 1055).

[216] *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805–06 (8th Cir. 2010) (quoting *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006)).

[217] *Id.*

[218] *Ryan*, 850 F.3d at 427 (emphasis added) (quoting *Graham*, 490 U.S. at 396).

to stop another officer from using excessive force[219] and for conspiring to use excessive force.[220] But both of those claims are distinct from an excessive force claim, meaning they must be pleaded in a plaintiff's complaint.  Ms. Anderson did not allege a failure-to-intervene claim or a conspiracy claim.[221]

From 8:10:28 p.m. until 8:10:52 p.m., Officer Driskill's conduct consisted of little more than holding Mr. Warren's hands to the ground and attempting to roll Mr. Warren onto his stomach to handcuff him safely.  In light of all the circumstances, this conduct was objectively reasonable. Mr. Warren was actively resisting arrest and was blatantly defying the Officers' verbal commands. Even together, Officers Driskill and Krupin were unable to flip Mr. Warren over. The police must be able to secure a suspect in handcuffs, especially one that has shown a willingness to flee and is still resisting.  At this point, Officer Driskill was part of an effort to do this with the least force possible.

Subsequently, in an attempt to get Mr. Warren to roll over, Officer Krupin administered a five-second drive stun to Mr. Warren's abdomen after issuing four verbal warnings to Mr. Warren.[222]  As explained above, Officer Driskill is not liable for the conduct of another officer. But even assuming Officer Krupin's conduct could somehow be imputed to Officer Driskill, the

---

[219] *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009) ("A police officer who fails to act to prevent the use of excessive force may still be held liable where (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.") (quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)).

[220] *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999) ("To prove a § 1983 conspiracy claim against a particular defendant, the plaintiff must show: that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff.").

[221] *Johnson v. Carroll*, 658 F.3d 819, 828 n.2 (8th Cir. 2011) (refusing to address a failure to intervene claim because the plaintiff "failed to state such a claim in her complaint").

[222] The Eighth Circuit has "eschewed a bright-line rule requiring officers to issue a warning before deploying a taser against a suspect."  *Boudoin v. Harsson*, 962 F.3d 1034, 1043 (8th Cir. 2020) (citing *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)).

use of a drive-stun taser was not unreasonable under the circumstances.  "[I]t is excessive force to use a taser on a nonfleeing, nonviolent misdemeanant."[223]   But the Eighth Circuit routinely "permit[s] officers to use tasers on noncompliant, violent suspects."[224]   In fact, the Eighth Circuit has said that even "passively resisting subjects can pose a threat necessitating the use of taser force."[225]   And the Eighth Circuit has repeatedly held that "a tasing in drive-stun mode 'only causes discomfort and does not incapacitate the subject,' suggesting that the effects of such force are *de minimus*."[226]

Mr. Warren (who at that point had already resisted arrest and fled from an officer) was noncompliant, and he was actively fighting with Officers Krupin and Driskill in what appeared to be an effort to free himself from their grasps.  Even if Mr. Warren's motive for resisting was innocent, and even if he had a mental illness that the Officers knew of, Officers Krupin and Driskill could have reasonably interpreted Mr. Warren's actions as resistance and responded with an amount of force that was reasonable to effectuate the arrest.[227]   They had already tried verbal commands and simple arm/body strength to get Mr. Warren to acquiesce to being handcuffed.  A single drive-stun tase—designed to cause only discomfort—was a reasonable use of force under the circumstances and from the perspective of a reasonable officer reacting in the heat of the moment after other, lighter tactics failed.  Moreover, this use of force appeared wholly ineffective

---

[223] *Franklin v. Franklin Cty., Arkansas*, 956 F.3d 1060, 1062 (8th Cir. 2020).

[224] *Id.*

[225] *Cravener*, 885 F.3d at 1140.

[226] *Franklin*, 956 F.3d at 1062 (quoting *Brossart v. Janke*, 859 F.3d 616, 626 (8th Cir. 2017)).

[227] *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) ("Even if Carpenter's motive was innocent, the deputies on the scene reasonably could have interpreted Carpenter's actions as resistance and responded with an amount of force that was reasonable to effect the arrest.") (citing *McKenney*, 635 F.3d at 360).  Defendants assert that Mr. Warren "suffered cardiac arrest and subsequent respiratory arrest most likely secondary to methamphetamine or substance abuse."  Defs.' Statement of Material Facts (Doc. 27) ¶ 73. Ms. Anderson denies this theory of injury and maintains that Mr. Warren's injury was a crushed trachea.  Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶¶ 73, 61–72. Ms. Anderson did not put forth any evidence indicating that Mr. Warren suffered a crushed trachea as a result of the first tasing.  *See, e.g.*, *id.*

in tempering Mr. Warren's defiance; its ineffectiveness suggests its *de minimus* nature.

Even if Officer Krupin's conduct could be imputed to Officer Driskill, and even if the tasing could be deemed unreasonable, Officer Driskill would still be entitled to qualified immunity under the second step in the qualified immunity analysis. In *De Boise v. Taser International, Inc.*, the Eighth Circuit held that it was not clearly unconstitutional to tase (at least six times "in barb mode" and twice in "drive stun mode") a suspect known to the officers to be suffering from a mental illness where the suspect was noncompliant, violent, and aggressive.[228] If Officer Krupin's administration of the drive stun did not violate a clearly established right, "then [Officer Driskill] would not have had 'fair notice' that [Officer Krupin] was using unconstitutionally excessive force against [Mr. Warren] either."[229]

Considering all of the facts previously identified, as well as the additional developments just discussed, the Court finds that the force applied thus far was objectively reasonable. Ms. Anderson has failed to identify a genuine question of material fact that would permit a rational juror to rule in her favor with respect to the first tasing. Because the force used was objectively reasonable, Ms. Anderson cannot demonstrate the deprivation of a constitutional or statutory right. Moreover, even if Officer Krupin's conduct were unconstitutional, and even if it somehow could be imputed to Officer Driskill, the Court finds that no reasonable officer observing Mr. Warren's behavior "would have understood the actions taken to be so disproportionate and unnecessary as to amount to a violation of [Mr. Warren's] rights."[230] Therefore, Officer Driskill is entitled to qualified immunity with respect to the events culminating in the first drive-stun tasing.

---

[228] *De Boise*, 760 F.3d at 897–98.

[229] *McManemy v. Tierney*, 970 F.3d 1034, 1040 (8th Cir. 2020) (discussing failure to intervene).

[230] *De Boise*, 760 F.3d at 897–98.

### D.  The Chokehold (*Vascular Restraint*)

Officer Driskill filled a supporting role in ultimately subduing Mr. Warren.  He was not the Officer who applied the chokehold to Mr. Warren.  In fact, at times, Officer Driskill had difficulty finding a way to effectively assist Officers Krupin and Berumen.  But Officer Driskill was the one who applied the handcuffs to Mr. Warren once Mr. Warren fell unconscious.  Thus, while Officer Driskill was involved in this part of the arrest, there is no question that he played a smaller role than Officers Krupin and Berumen.

Before the application of the chokehold, the Officers had tried a number of verbal and physical maneuvers to obtain compliance from Mr. Warren.  None worked.  Officer Krupin tried a five-second drive stun.  It did not work.  Mr. Warren's active resistance persisted.  Indeed, Mr. Warren's erratic and belligerent behavior escalated.  It is indisputable that Mr. Warren was kicking and wrestling with the Officers.  And it is indisputable that Mr. Warren refused to comply with multiple commands to roll over, to stop resisting, and to relax his arm.  All this at night, adjacent to a public road, and with a suspect that had already once fled from a police officer at the start of this incident.  Even after Officer Krupin applied a chokehold, Mr. Warren still refused to give his arm to Officer Driskill.  Only with the combined effort of all three Officers, and only after Mr. Warren fell unconscious, were the Officers able to finally subdue Mr. Warren.

Chokeholds (vascular restraints) are dangerous maneuvers. It is obvious that they should not be performed unless (1) other lighter intervention techniques have been tried and failed, and (2) there is a serious and immediate need to gain control over the suspect.  In the case at bar, both prongs are met.  Officers were facing a stark choice—either get Mr. Warren handcuffed, continue fighting with him (which could have led to injury), or let him flee into the night down a dark public road in a highly agitated state.  Considering Officer Driskill's conduct under the circumstances

and from the perspective of a reasonable officer, the Court finds that Officer Driskill used an objectively reasonable degree of force.  The Court also finds that it was objectively reasonable for Officer Driskill to have supported Officers Krupin and Berumen.  Ms. Anderson has failed to identify a genuine question of material fact that would permit a rational juror to rule in her favor with respect to Officer Driskill's participation in the events surrounding the chokehold.

As stated above, Officer Driskill can "be held liable only for his . . . own use of excessive force."[231]  But even assuming that Officer Driskill could somehow be held liable for Officer Krupin's conduct, the Court would find Officer Driskill entitled to qualified immunity.  The Eighth Circuit has clearly established that "it violates the Fourth Amendment to choke a suspect who is handcuffed and not resisting."[232]  But the Eighth Circuit has not spoken so plainly on the use of chokeholds when a suspect is not handcuffed and is actively resisting arrest and fighting with officers.  Ms. Anderson has not pointed the Court to any caselaw on the topic.

Thus, even assuming the use of a chokehold was unreasonable, the right to be free from chokeholds under these particular circumstances was not "clearly established at the time of the deprivation."[233]  Nor was it clearly established at the time of the deprivation that Officer Driskill could be liable for Officer Krupin's administration of a chokehold outside of a claim alleging a failure to intervene.[234]  Officer Driskill is entitled to qualified immunity with respect to the events surrounding the chokehold.[235]

---

[231] *Smith*, 586 F.3d at 581.

[232] *Tatum v. Robinson*, 858 F.3d 544, 552 (8th Cir. 2017).

[233] *MacKintrush*, 987 F.3d at 770 (quoting *Ehlers*, 846 F.3d at 1008).

[234] As stated above, "clearly established law" is not defined at "a high level of generality."  *Ashcroft*, 563 U.S. at 742.  For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ryan*, 850 F.3d at 427 (quoting *White*, 137 S. Ct. at 551).

[235] Even assuming the Officers knew of Mr. Warren's mental illness, the outcome is the same.  Under the circumstances of this arrest, the fact that Mr. Warren's crimes and resistance could be attributed to a mental illness does not outweigh the other factors that suggest the reasonableness of Officer Driskill's conduct.  And it certainly

### E.  The Leg Slam, Second Tasing, and Leg Shackles

"[A] reasonable officer is not permitted to ignore changing circumstances."[236]  Of course, that is not to say that what had happened up to this point is irrelevant.[237]  Rather, it is to say that each use of force should be considered separately under the circumstances as they exist at the time the force is applied, which is naturally informed by the events that have already transpired.[238]

The big change at this point is that Mr. Warren was now in handcuffs.  "[W]hen a person is subdued and restrained with handcuffs, a 'gratuitous and completely unnecessary act of violence' is unreasonable and violates the Fourth Amendment."[239]  But reasonable force is still constitutional.  For instance, in *Brossart v. Jake*, the Eighth Circuit affirmed the district court's dismissal of a plaintiff's claim that an officer used excessive force against him when the officer tased the plaintiff while the plaintiff "was handcuffed and detained in the back seat of a squad car . . . ."[240]  The Eighth Circuit noted that the plaintiff had been violent before he was handcuffed, that after the plaintiff was handcuffed he continued to "verbally resist" the officers, and that the plaintiff continued to resist lawful arrest by refusing to comply with the officers' lawful commands.[241]  On balance, the Eighth Circuit reasoned that the use of a taser in drive-stun mode was not excessive given the plaintiff's continued resistance and the relatively minor infliction of

---

doesn't make the use of force a violation of a clearly established right.

[236] *Masters*, 998 F.3d at 836 (quoting *Neal*, 895 F.3d at 581).

[237] *Brossart*, 859 F.3d at 626 ("Plaintiffs argue the district court inappropriately considered facts preceding Thomas's arrest in granting Braathen qualified immunity. This contention is frivolous. *Graham v. Conner* requires taking all relevant circumstances into account . . . ." (internal citation omitted)).

[238] *See, e.g.*, *Jackson v. Stair*, 944 F.3d 704, 712 (8th Cir. 2019) (finding error where the district court did not analyze as a separate use of force a second tasing that nearly instantaneously and without warning followed a first tasing).

[239] *Kohorst*, 968 F.3d at 878 (quoting *Blazek v. City of Iowa City*, 761 F.3d 920, 926 (8th Cir. 2014)).

[240] *Brossart*, 859 F.3d at 626.

[241] *Id.*

harm.[242]

In the case at hand, the circumstances changed when Mr. Warren was handcuffed. Although Mr. Warren could still be characterized as a belligerent misdemeanant that fled and resisted arrest, he was now restrained by handcuffs and clearly under police control. At this point, Mr. Warren presented little to no danger to the public. But he still posed some degree of danger to himself and the Officers.[243] Indeed, Mr. Warren had shown himself to be a formidable opponent, having for some time successfully resisted three trained Officers' attempts to subdue him. It was only after Mr. Warren fell unconscious that the Officers were finally able to handcuff him.

When Mr. Warren regained consciousness, his obstinance resumed. It is indisputable that Mr. Warren remained defiant even after he was handcuffed. And it is indisputable that Mr. Warren was erratically kicking his legs into the air. When Officer Driskill knelt beside Mr. Warren to try to verbally calm Mr. Warren down, Mr. Warren kicked Officer Driskill at least once. In response, Officer Driskill slammed Mr. Warren's legs to the ground and then secured one of Mr. Warren's legs against Officer Driskill's chest. Almost immediately thereafter, Officer Driskill rose to his feet, separated himself from Mr. Warren, and never physically reengaged with Mr. Warren.

Perhaps Officer Driskill could have simply stepped back from Mr. Warren at this point. But Officer Driskill's conduct was not a gratuitous and completely unnecessary act of violence. To the contrary, Officer Driskill responded to an act of aggression from Mr. Warren by controlling the precise part of his body Mr. Warren was using to be aggressive. Moreover, there is nothing in the record to suggest that slamming Mr. Warren's leg to the ground caused Mr. Warren any injury or inflicted any damage. Plaintiff does not argue otherwise. This use of force was transient and

---

[242] *Id.*

[243] The Eighth Circuit has repeatedly recognized that "[a] person in handcuffs can still present a danger to officers." *Franklin*, 956 F.3d at 1062–63.

*de minimis*. Officer Driskill's conduct was reasonable under the circumstances; at a minimum it did not violate clearly established law.[244]

As to the tasing that occurred around this time, Officer Driskill was not physically assisting Officers Krupin and Berumen when Officer Krupin administered the second drive stun.  But even assuming he had been assisting, and even assuming that Officer Krupin's conduct could somehow be imputed to Officer Driskill, the use of a drive stun was not an unreasonable use of force in light of the Eighth Circuit's ruling in *Brossart*.[245]  Although there was a far lower likelihood of Mr. Warren fleeing while his arms were handcuffed behind him, the chance was not zero.  This arrest took place outside in the dark near a public road.  It was not an entirely controlled or controllable situation.  Moreover, at some point police must be allowed to stop a handcuffed suspect from kicking at them.  After all, they need to interact with such a suspect to bring him to a detention facility.  After verbal attempts to get this conduct to stop, a short drive stun is not unreasonable.

Moreover, even if the force were unreasonable, the right to be free from the administration of a drive-stun tase under these particular circumstances was not "clearly established at the time of the deprivation."[246]  Nor was it clearly established at the time of the deprivation that Officer Driskill could be liable for Officer Krupin's administration of a drive stun outside of a claim alleging a failure to intervene.[247]  Ms. Anderson has not pointed the Court to any caselaw to the contrary.  Thus, Officer Driskill is entitled to qualified immunity.

---

[244] Ultimately, Officers Berumen and Krupin were able to handcuff Mr. Warren's legs.  The remainder of the bodycam footage reveals that Mr. Warren continued to try to stand up and move around in a way that the Officers could reasonably believe was an attempt to flee, even after his legs and feet were handcuffed.  And Mr. Warren continued to kick and resist as Officer Krupin, Officer Berumen, and the paramedic attempted to prepare Mr. Warren for transport.

[245] *Brossart*, 859 F.3d at 626–27.

[246] *MacKintrush*, 987 F.3d at 770 (quoting *Ehlers*, 846 F.3d at 1008).

[247] *See supra* note 234.

### F.  Additional Excessive Force Allegations

The Court wishes to be plain.  The facts set forth in the Corresponding Bodycam section above regarding "Additional Excessive Force Allegations" (*see supra* text pp. 17–19) are disturbing.  But these facts don't involve Officer Driskill.  Officer Driskill is not liable for any excessive force during this period of time because he was no longer physically engaged with Mr. Warren.  As noted in Defendants' Brief, § 1983 claims necessarily fail "when the plaintiff fails to factually allege that the Defendant had any involvement in the claim."[248]  And as stated above, Ms. Anderson did not allege claims for failure to intervene or conspiracy under which Officer Driskill might more reasonably be tagged with liability.  Accordingly, Officer Driskill is entitled to summary judgment with respect to any allegations of excessive force that occurred after Officer Driskill was no longer physically engaged with Mr. Warren or directly assisting those who were physically engaged with Mr. Warren.

## II.    Chief Thompson – Failure to Train and Supervise

Ms. Anderson asserts that Chief Thompson (and the City of Blytheville) is liable for violating Mr. Warren's constitutional rights because Chief Thompson failed to train and supervise "Defendant Police Officer(s) . . . ."[249]  Aside from Chief Thompson himself, Officer Driskill is the only "Defendant Police Officer" in this case.

"A supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the

---

[248] Defs.' Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 26) at 11 (citing *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001)); *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999) (explaining that a plaintiff must allege the defendant was involved in or responsible for the constitutional violation to state a § 1983 claim).

[249] Pl.'s Compl. (Doc. 2) ¶ 28.

violation."[250]   To succeed on a failure to train or supervise claim, Ms. Anderson must show that Chief Thompson "(1) had 'notice of a pattern of unconstitutional acts committed by [Officer Driskill]'; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take 'sufficient remedial action'; (4) proximately causing injury to [Mr. Warren]."[251]   To show deliberate indifference or tacit authorization, Ms. Anderson must show that Chief Thompson "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation."[252]

Ms. Anderson argues that Chief Thompson (and the City) failed to train Officer Driskill in "crisis intervention" and on how to constitutionally arrest a person with mental illness.[253]   She similarly argues that Chief Thompson (and the City) failed to properly supervise its officers by failing to send an officer that was properly trained in crisis intervention.   Aside from these conclusory assertions, Ms. Anderson failed to identify any facts or law to support her claims that Chief Thompson's failure to train and supervise Officer Driskill deprived Mr. Warren of his constitutional rights.

It is true, as Plaintiff's counsel argued at the motion hearing, that Officer Driskill was not trained in crisis intervention at the time of the incident.[254]   But there is no legal requirement for Officer Driskill to be a "crisis intervention team officer" before he can respond to a crime.   Indeed, Arkansas Code Annotated section 20-47-801 *et. seq.* does not limit an officer's ability to confront and arrest a mentally impaired criminal suspect.   Rather, it simply broadens the scope of options

---

[250] *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 673 (8th Cir. 2007).

[251] *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)).

[252] *Id.* (quoting *Andrews*, 98 F.3d at 1078).

[253] Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 43) at 20.

[254] *See, e.g*, April 8, 2021 Hr'g Tr. at 59–60, 70.

available to a trained officer working within a "crisis intervention team."

The record evidence suggests Officer Driskill was well trained and highly experienced in all the areas required for him to legally engage with Mr. Warren.  It is undisputed that at the time of the incident, "Officer Driskill attended and completed the 13-week Law Enforcement Training Academy ("LETA") in 2016, totaling 577 hours of training."[255]  It is likewise undisputed that "Officer Driskill . . . attended and completed the Federal Law Enforcement Academy from May 2007 until September 2007, totaling 647 hours of training."[256]  And it is undisputed that, "[i]n addition to his four years with the BPD, Officer Driskill also worked as Border Patrol for almost a year, with the Jonesboro Police Department as a patrol officer for approximately a year, and as a military police officer from 1997-2007."[257]

In any event, even if crisis intervention training were a necessity, Ms. Anderson's failure to train and supervise claims are fundamentally flawed because Officer Driskill's conduct did not result in an unconstitutional deprivation of Mr. Warren's rights.  As noted above, the Eighth Circuit has been clear in holding that knowledge of a disability cannot foreclose officers from protecting themselves or the general public when faced with a threat.[258]  In *Sok Kong Trustee for Map Kong v. City of Burnsville*, the Eighth Circuit found that the use of deadly force against a mentally impaired man (high on meth) was reasonable even though the police department's "training" and "policy" "advised that 'taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis.'"[259]  The Eighth Circuit further explained that

---

[255] Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶ 83.

[256] *Id.* ¶ 84.

[257] *Id.* ¶ 85.

[258] *See supra* note 203.

[259] *Sok Kong*, 960 F.3d at 993.

"[e]ven if officers 'created the need to use' deadly force by trying to disarm a mentally ill person," they were still entitled to use reasonable force to subdue the suspect.[260]

Ms. Anderson has failed to identify any facts that would permit a rational juror to conclude that Chief Thompson's (or the City's) alleged failure to train or supervise Officer Driskill proximately caused a constitutional deprivation. Chief Thompson is therefore entitled to qualified immunity and judgment as a matter of law.[261]

## III.    First, Fifth, Sixth, Eighth, and Fourteenth Amendment Claims

Ms. Anderson also alleges federal claims under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.[262]   Specifically, Ms. Anderson contends that Defendants inflicted punishment on Mr. Warren "for the purpose of quelling [Mr.] Warren's verbal expression" in violation of the First Amendment.[263]   Ms. Anderson alleges that Defendants' use of force and policies (or lack thereof) deprived Mr. Warren of his right to a trial by jury in violation of the Sixth Amendment and constituted cruel and unusual punishment under the Eighth Amendment.[264]   And Ms. Anderson alleges that Defendants' use of force and policies (or lack thereof) resulted in "unwanted and unreasonable restraints" in violation of the Fifth and Fourteenth Amendments.[265] Defendants assert that none of these claims are cognizable in this case.[266]   Defendants are correct with respect to the claims under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

---

[260] *Id.* at 993–94 (citing *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995)).

[261] It's also worth noting that there is no record evidence that Officer Driskill acted poorly in prior policing situations or evidence that Chief Thompson or the City of Blytheville knew that Officer Driskill needed closer supervision or training.

[262] Pl.'s Compl. (Doc. 2) ¶¶ 2, 26–29; Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc 42) at 21.

[263] Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc 43) at 21.

[264] Pl.'s Compl. (Doc. 2) ¶ 27.

[265] Pl.'s Compl. (Doc. 2) ¶¶ 27–29; Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc 43) at 21.

[266] Defs.' Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 26) at 20.

"[T]he Fifth Amendment applies only to the federal government or federal actions."[267] Defendants are not federal actors, so the Fifth Amendment does not apply.[268]  Similarly, courts have repeatedly held that Sixth Amendment rights do not attach until "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."[269]  Although Mr. Warren had been arrested, no judicial criminal proceedings had commenced, so the Sixth Amendment does not apply.  With respect to the Eighth Amendment, the Eighth Circuit has plainly stated that the Eighth Amendment applies only to convicted prisoners, not pre-trial detainees.[270]  Mr. Warren was not a convicted prisoner, so the Eighth Amendment does not apply.  Finally, the Supreme Court and the Eighth Circuit have held that "the Fourteenth Amendment does not apply to excessive force claims involving arrests, which are appropriately reviewed under a Fourth Amendment analysis."[271]

Ms. Anderson's First Amendment claim is at least cognizable.  But beyond mere cognition, it utterly fails.  To succeed on her claim, Ms. Anderson must show "(1) that [Mr. Warren] engaged in a protected activity; (2) that [Officer Driskill] took adverse action against [Mr. Warren] that

---

[267] *Stair*, 944 F.3d at 709 (citing *Barnes v. City of Omaha*, 574 F.3d 1003, 1005 n.2 (8th Cir. 2009)); *see also Dusenbery v. United States*, 534 U.S. 161, 167 (2002).

[268] *See* Pl.'s Compl. (Doc. 2) ¶¶ 4–8.

[269] *United States v. Ingle*, 157 F.3d 1147, 1151 (8th Cir. 1998) (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)).  Most of the U.S. Supreme Court and Eighth Circuit cases that discuss when Sixth Amendment rights attach specifically refer to the right to counsel.  *See Moran v. Burbine*, 475 U.S. 412, 428 (1986) (explaining that the Sixth Amendment right to counsel "attaches only after the first formal charging procedure"); *Ingle*, 157 F.3d at 1151 (explaining that the Sixth Amendment right to counsel "does not attach until after the initiation of formal charges").  However, the Court has no reason to believe that the Sixth Amendment right to a trial by jury is any different, such that it attaches before the initiation of formal charges.  Indeed, this District has stated that the entire Sixth Amendment does not attach until that point.  *Wren v. Tucker*, No. 3:09-cv-00118 JMM, 2012 WL 369929, at *3 (E.D. Ark. Feb. 6, 2012) ("The Sixth Amendment attaches at or after the initiation of adversary judicial criminal proceedings . . . ") (internal quotations omitted).

[270] *Hott v. Hennepin Cty., Minn.*, 260 F.3d 901, 905 (8th Cir. 2001).

[271] *Stair*, 944 F.3d at 709 (citing *Graham*, 490 U.S. at 395 ("Today we make explicit what was implicit in *Garner*'s analysis, and hold that all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.")).

would chill a person of ordinary firmness from continuing the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity."[272]

Even if Mr. Warren's excited ramblings as he resisted arrest constitute protected activity, no rational juror could conclude from this record that Officer Driskill (or any other officer for that matter) took adverse action against Mr. Warren for his excited ramblings.  It is true that Officers Krupin, Berumen, and Driskill repeatedly instructed Mr. Warren to stop talking.  But there is no evidence that any of the Officers used force on Mr. Warren to suppress Mr. Warren's speech.  As discussed above, Officer Driskill's conduct was reasonably aimed at controlling Mr. Warren's physically belligerent and dangerous behavior.[273]  Once Mr. Warren's physical aggression was controlled, Mr. Warren continued to speak unimpeded.  And he was allowed to do so.

Defendants are entitled to judgment as a matter of law on Ms. Anderson's Fifth, Sixth, Eighth, and Fourteenth Amendment claims.  And because Ms. Anderson failed to allege that Mr. Warren was engaged in First Amendment protected activity, and because no rational juror could conclude that Officer Driskill's conduct was motivated by a desire to thwart Mr. Warren's speech, Defendants are entitled to judgement as a matter of law on Ms. Anderson's First Amendment claim.

## IV.    Claims Against the City of Blytheville

Defendants argue that they are entitled to judgment as a matter of law on all the claims against the City of Blytheville, which include the claims against Officer Driskill and Chief Thompson in their official capacities.[274]  In particular, they assert that Ms. Anderson has failed to

---

[272] *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013).

[273] "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  *Stair*, 944 F.3d at 709 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

[274] Defs.' Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 26) 13–14.  "Claims against individuals in their official

establish any underlying constitutional violation and, even if she has, Ms. Anderson has failed to identify an official policy or custom that caused a constitutional violation. Defendants are correct on both accounts.

Section 1983 does not establish any substantive rights on its own.[275] "Rather, it simply serves as a vehicle for 'vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.' Accordingly, an underlying constitutional or statutory violation is a predicate to liability under section 1983."[276] "[A]bsent a constitutional violation by a [municipal] employee, there can be no § 1983 or *Monell* liability for the [municipality]."[277] As explained in great detail above, Officer Driskill did not violate the Constitution under the First, Fourth, Fifth, Sixth, Eighth, or Fourteenth Amendments. Neither did Chief Thompson. Thus, the City of Blytheville is entitled to summary judgment on Ms. Anderson's *Monell* claim.

Even if Ms. Anderson had established a constitutional violation, her claims against the City would still fail because she failed to identify an official policy or custom that caused the violation. Indeed, a municipality cannot be held vicariously liable for its employees' unconstitutional conduct.[278] It can only be held liable when a municipal policy or custom is the "moving force" behind a constitutional violation.[279]

> Municipal policy may be found in written ordinances and
> regulations, in certain affirmative decisions of individual

---

capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights . . . ." *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (quoting *Hafer v. Melo*, 502 U.S. 21, 24–27 (1991)).

[275] *Henley v. Brown*, 686 F.3d 634, 640 (8th Cir. 2012).

[276] *Id.* (internal citation omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

[277] *Kingsley v. Lawrence Cty., Mo.*, 964 F.3d 690, 703 (8th Cir. 2020) (quoting *Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018)).

[278] *Wedemeier v. City of Ballwin, Mo.*, 931 F.2d 24, 26 (8th Cir. 1991).

[279] *Id.*

> policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens.  Outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so "persistent and widespread" and "so permanent and well settled as to constitute a 'custom or usage' with the force of law."[280]

At the time of the incident, it is undisputed that the City of Blytheville had a policy on the use of force.[281]  Ms. Anderson argues that the City of Blytheville's policy was unconstitutional because it permitted its officers to use discretion in deciding "whether to take a mentally ill person who is in a crisis to the county jail or to a hospital for treatment of their condition," thereby permitting officers to "override the judgment of medical professionals and to use any means necessary to effectuate an arrest . . . ."[282]  Ms. Anderson has not cited any authority supporting her contention that such a policy is unconstitutional.  And the Eighth Circuit has made clear that it is not unconstitutional.

In *Sok Kong*, the city of Burnsville enacted a training and department policy that advised that "taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis."[283]  But the policy also provided that "[n]othing in this policy shall be construed to limit an officer's authority to use reasonable force when interacting with a person in a crisis."[284]  The officers in *Sok Kong* exercised their discretion to use deadly force, rather than taking no action or passively monitoring the situation.[285]  The Eighth Circuit reasoned that the officers did not act contrary to the policy, given the provision affording them discretion.[286]  And

---

[280] *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (cleaned up).

[281] Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 44) ¶ 82.

[282] Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 43) at 19.

[283] *Sok Kong*, 960 F.3d at 993.

[284] *Id.*

[285] *Id.* at 990.

[286] *Id.* at 993.

the Eighth Circuit further noted that, even had the discretionary provision not existed, acting "contrary to training 'does not itself negate qualified immunity . . . so long as a reasonable officer could have believed that his conduct was justified.'"[287]   In other words, police officers may exercise discretion in using reasonable force whether or not a policy allows for it.  Like the policy in *Sok Kong*, the City of Blytheville's policy permitted its officers to use discretion in how best to handle a criminal suspect suffering from a mental health crisis.

The Court finds that the City of Blytheville's use of force policy at the time of the incident was not unconstitutional on its face because it did not require the City's law enforcement officers to act unconstitutionally.  Because Ms. Anderson failed to identify an underlying constitutional violation, and because she failed to identify an unconstitutional custom or policy, her claims against the City of Blytheville fail as a matter of law.  Defendants are therefore entitled to judgment as a matter of law with respect to these claims.

## V.      State Law Assault and Battery

Ms. Anderson alleges that Officer Driskill committed the torts of assault and battery against Mr. Warren.[288]   Under Arkansas law, "[b]attery is a wrongful or offensive physical contact with another through the intentional contact by the tortfeasor and without consent of the victim . . . ."[289]   Assault is an "intentional attempt by a person, by force or violence, to do an injury to the person of another, or as any attempt to commit a battery, or any threatening gesture showing in itself or by words accompanying it an immediate intention, coupled with a present ability, to commit a battery."[290]

---

[287] *Id.* (quoting *City of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015)).

[288] Pl.'s Compl. (Doc. 2) ¶ 30.

[289] *Costner v. Adams*, 82 Ark. App. 148, 156, 121 S.W.3d 164, 170 (Ark. App. 2003).

[290] *Id.*

Arkansas protects police officers from liability when effectuating an arrest. Indeed, Arkansas Code Annotated section 5-2-610 states that "a law enforcement officer is justified in using nondeadly physical force . . . upon another if the law enforcement officer reasonably believes the use of nondeadly force is necessary to [e]ffect an arrest or prevent the escape from custody of an arrested person unless the law enforcement officer knows that the arrest is unlawful."[291] A law enforcement officer is further justified in using nondeadly force to "defend himself . . . or a third person from what the law enforcement officer reasonably believes to be the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape."[292]

As already explained in great detail above, Officer Driskill used a reasonable degree of force in arresting Mr. Warren given Mr. Warren's belligerent behavior. Because Officer Driskill's conduct was justified, his physical contact with Mr. Warren was not "wrongful" and thus not battery. For the same reason, Officer Driskill cannot be said to have *attempted* to commit battery sufficient to establish a claim of assault. Ms. Anderson does not cite any caselaw to the contrary. Rather, she repeats her same assertions that Officer Driskill's conduct was tortious and unconstitutional because Mr. Warren had a mental illness. For all the reasons discussed above, that argument fails. Officer Driskill is therefore entitled to judgment as a matter of law.[293]

### Federal Rule of Civil Procedure 56(d) Request

There's a final issue for the Court to address. Ms. Anderson appears to believe that the

---

[291] Ark. Code Ann. § 5-2-610(a)(1).

[292] *Id.* at § 5-2-610(a)(2).

[293] To the extent Officer Driskill was not justified in any of his conduct, for the reasons stated in the rest of this opinion, he is still entitled to qualified immunity under Arkansas law. Ms. Anderson does not dispute that Arkansas law is currently interpreted as including the qualified immunity doctrine. She says this understanding of Arkansas law is incorrect and she invites this Court to abolish the doctrine entirely. That's not something a District Court can do.

Court should allow additional discovery before resolving the Motion for Summary Judgment.  As the Court explains below, she has not made a timely and proper 56(d) request.  But even if she had done so, she does not meet the standard set out by the Eighth Circuit for 56(d) relief.

The Discovery deadline set by the Court's Second Amended Final Scheduling Order expired on June 19, 2020.[294]  Defendants' filed the instant Motion for Summary Judgment on July 20, 2020, which was the last day allowable.  Under the Scheduling Order and Local Rule 7.2(b), Ms. Anderson had fourteen days to "file with the Clerk a concise statement in opposition to the motion with supporting authorities."[295]  Defendants could then file a reply within 7 days.  The Scheduling Order and the Local Rule make clear that "[n]o surresponse or surreply will be permitted, absent express direction by the Court."[296]

On July 29, 2020, Ms. Anderson asked the Court to stay the case or extend the deadline for responding to summary judgment because her counsel had late-stage terminal cancer.[297]  She asked to extend the response deadline by at least 60 days, which she said "will allow her counsel time to engage the assistance of someone to review the files and prepare [a] response[]" to the Motion for Summary Judgment.[298]  Finding this a very reasonable request, the Court extended the deadline for responding to summary judgment by 90 days, making the new deadline October 2, 2020.[299]

On September 16, 2020, Ms. Anderson (now with new counsel) moved once again to amend the schedule.[300]  She asked to "extend all outstanding deadlines set forth in the Second

---

[294] Second Am. Final Scheduling Order (Doc. 24) ¶ 2.

[295] Third Am. Final Scheduling Order (Doc. 41) ¶ 7.

[296] *Id.*

[297] Mot. for Stay (Doc. 31) ¶¶ 2, 5, 6.

[298] *Id.* ¶ 6.

[299] Text Order (Doc. 32).  The 90-day extension fell on a Saturday, thus Plaintiff's response was due the following Monday.

[300] Pl.'s Third Mot. to Amend the Scheduling Order (Doc. 37).

Amended Final Scheduling Order by one hundred and eighty days . . . ."[301]  Although the discovery and pleading deadlines (having already passed) were not outstanding, the context of the motion suggests that Ms. Anderson was asking for an extension of those deadlines in addition to the deadline for her response to summary judgment.[302]  For reasons discussed in prior Orders by the Court[303] and discussed to some extent below, the Court denied the request to re-open discovery or the time for amendment of the complaint.[304]  But the Court partially granted the request for additional time to respond to the Summary Judgment Motion.[305]  The Court gave Ms. Anderson an additional 45 days (approximately) to file a Response, making the deadline November 30, 2020.

On November 30, 2020, Ms. Anderson filed a Response, a Brief in Support of her Response, and a Statement of Facts.[306]  She did ***not*** file a Rule 56(d) motion or affidavit.  After a short extension of time, Defendants filed a Reply on December 14, 2020.[307]  Then, on February 2, 2021, Ms. Anderson filed a document titled "Supplemental Affidavit Under Rule 56(f) of the Federal Rules of Civil Procedure."[308]  Since subsection (f) is now "Judgment Independent of the Motion," I am going to assume Ms. Anderson meant her Affidavit to be a Rule 56(d) Affidavit.  In relevant part, the Affidavit stated that her prior counsel "never took the depositions that we need

---

[301] *Id.* ¶ 5.

[302] *See id.* (stating that the extension would "allow counsel for Plaintiff to familiarize themselves with the case, *adequately investigate the claims*, and *amend the pleadings* as necessary") (emphasis added).

[303] *See* Text Order (Doc. 40); Order Denying Mot. to Amend (Doc. 70).

[304] Text Order (Doc. 40).

[305] *Id.*

[306] Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 42); Pl.'s Br. in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 43); Pl's Resp. to Defs.' Statement of Material Facts (Doc. 44).

[307] Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 55).

[308] Affidavit re Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 66).  In the meantime, the parties had filed dueling papers on Ms. Anderson's Motion to Amend the Complaint, which the Court addressed in its Order Denying the Motion to Amend.  Order Denying Mot. to Amend (Doc. 70); s*ee also* Pl.'s Mot. to Amend (Doc. 50); Defs.' Resp. to Pl.'s Mot. to Amend (Doc. 52); Defs.' Br. in Supp. of Defs.' Resp. to Pl.'s Mot. to Amend (Doc. 53).

to respond fully to the defendants' Motion for Summary Judgment . . . ."[309]  It also stated that "we never received discovery of relevant documents and other materials from the defendants before the discovery deadlines and [the deadlines] for amendment of pleadings . . . ."[310]

There are several problems with Ms. Anderson's Rule 56(d) affidavit.  First, it is not clear that a Rule 56(d) request is in order after the expiration of the discovery deadline in a Court's scheduling order.  The Eighth Circuit has made clear on numerous occasions that "[t]he purpose of this rule is 'to prevent a party from being unfairly thrown out of court by a premature motion for summary judgment.'"[311]  Rule 56(d) is essentially a protective mechanism to effectuate "[t]he general rule . . . that summary judgment is appropriate 'only after the nonmovant has had adequate time for discovery.'"[312]

Still, it is fair to say that the language of the Rule does not expressly limit itself to situations where the discovery period is ongoing.  So let's assume that a Rule 56(d) request can, in theory, be made even after the expiration of the discovery deadline.  A second problem for Ms. Anderson is that the Court's Scheduling Order (as further amended) and the Local Rules (1) clearly required all responses to summary judgment to be made by November 30, 2020, and (2) clearly prohibited surrresponses.  If Ms. Anderson wanted to raise a 56(d) issue, she was required to do so at the time of her response to the Summary Judgment Motion—not more than 2 months later.  The violation of the Local Rules and the Court's Scheduling Order are by themselves sufficient grounds to deny the 56(d) request.

Even if Ms. Anderson's request was timely and proper, it fails to meet the Eighth Circuit's

---

[309] Affidavit re Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 66) ¶ 10.

[310] *Id.*

[311] *Jackson v Riebold*, 815 F.3d 1114, 1121 (8th Cir. 2016).

[312] *Id.* (quoting *Toben v. Bridgestone Retail Opers., LLC*, 751 F.3d 888, 894 (8th Cir. 2014)).

standard for granting 56(d) relief.  "[T]o obtain a Rule 56(d) continuance, the nonmovant 'must file an affidavit affirmatively demonstrating … how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'  A district court has 'wide discretion' in ruling on a Rule 56(d) motion."[313] Ms. Anderson's Affidavit doesn't say anything of the sort.  Instead, it vaguely and generally asserts that her prior lawyer didn't take several depositions and get unidentified discovery that would allow a "full[er]" response to the Summary Judgment motion.[314]

It is likely that Ms. Anderson realized the substantive shortcomings of her Affidavit.  On the evening of April 7, 2021, the day the Court held a hearing on the Motion for Summary Judgment, Ms. Anderson filed a document titled "Third Affidavit in Support of Plaintiff's Partial Response to Defendants' Motion for Summary Judgment."[315]  Although the title does not suggest it is a Rule 56(d) Affidavit, the substance of the document does.[316]  And it states more specifically than the First Affidavit what information Ms. Anderson believes additional discovery would uncover.  Upon request of the Defendants, the Court struck this document as untimely.[317]  This document was even more out of time than the first 56(d) Affidavit.  Ms. Anderson cannot simply file documents responding to Summary Judgment whenever she wants and in a piecemeal fashion. Doing so makes it impossible for the Defendants to fairly respond to arguments and for this Court to resolve the outstanding issues in an orderly fashion.  There was no good reason for the delay.

Even if I were to consider the substance of the Affidavit, it still does not meet the Eighth

---

[313] *Id.* (internal citation omitted) (quoting *Toben*, 751 F.3d at 894).

[314] Affidavit re Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 66) ¶ 10.

[315] Third Affidavit in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 79).

[316] *Id.* ¶ 5.

[317] Text Order (Doc. 102).

Circuit's substantive standard for Rule 56(d) relief.  For example, consider Paragraphs 5A and 5B.[318]  These paragraphs contain the exact type of general and vague assertions that fail the test.

In paragraph 5C, Ms. Anderson says that "[i]f additional discovery is allowed, I will be able to take the deposition of Dr. John Thomas at St. Bernard's Medical Center regarding his statement that my son's vegetative state was a result of being deprived of air. . . . This deposition is necessary to authenticate medical records and to show that my son's vegetative state was caused by being choked and deprived of air by Defendant . . . Driskill and the other police officers who assisted Driskill in the September 29, 2018 arrest of my son, and not from a 'drug overdose.'"[319] But authentication of the medical records that the parties have presented is unnecessary at this stage—the Court has assumed for purposes of summary judgment that the medical records are authentic.  More importantly, the Court has assumed for purposes of summary judgment that Plaintiff is correct in its position that a crushed trachea was the cause of death.  In light of these assumptions, the information Ms. Anderson describes is not the sort of information that is necessary to rebut the movants' showing of an absence of a genuine issue of material fact.  Put another way, even if Ms. Anderson secured the facts she seeks, it would not alter the outcome of the pending Summary Judgment Motion.

In paragraph 5D, Ms. Anderson says she "would like to take the deposition of Defendant . . . Driskill to prove that he did not have the crisis intervention training and de-escalation training that was required to respond to a call of a person having a mental health crisis, including a bad reaction to drugs."[320]  But a failure-to-train claim would only be viable if Officer Driskill had committed a constitutional violation and did so because of the purported failure to train.  Because

---

[318] Third Affidavit in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 79) ¶ 5.

[319] *Id.*

[320] *Id.*

the Court has concluded that Driskill did not commit a constitutional violation, there is no potential for a viable failure-to-train claim regardless of what information might come out at a deposition.[321]

In paragraph 5E, Ms. Anderson says she "would like to take the deposition of the custodian of records of the Blytheville Police Department and the Blytheville Chief of Police regarding the police department's policies and procedures regarding mentally ill persons and persons having a 'mental health crisis' who are going to be placed under arrest."[322]   What has already been written about paragraph 5D—in both text and footnote—applies equally here.  Moreover, this request seems more like the proverbial fishing expedition than a narrow request calculated to be able to rebut a movant's showing of the absence of a genuine issue of material fact.

In paragraph 5F, Ms. Anderson says she "would like to take the depositions of Officers Santos Berumen, Nathan Krupin, and Doyne Driskill regarding the approximately 3-4 minutes of body camera footage that is missing from the materials provided by the Defendants in their disclosures to the Plaintiff."[323]   She says that "[t]he whereabouts and actions of each officer is critical to establishing that my son was being intentionally deprived of air and was unable to breath[e] during that time."[324]   There are at least three problems here.  First, Ms. Anderson is essentially going on a fishing expedition.   She hopes a deposition would reveal something nefarious about the whereabouts and conduct of Officer Driskill; but she has no evidence to suggest

---

[321] In any event, Rule 56(d) "is designed to minister to the vigilant, not to those who slumber on perceptible rights." *Beatty v. Synthes (USA)*, 101 Fed. App'x 645, 646 (8th Cir. 2004) (unpublished) (quoting *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 92 (1st Cir.1996)).   From the very outset of this case (back in October of 2018), Ms. Anderson knew that Officer Driskill was the arresting officer and knew that that her son had mental illness issues.   Very shortly after that, Ms. Anderson knew her son had been on illegal substances the night of the arrest.   Ms. Anderson had approximately one year to depose Officer Driskill before anyone even suggested that her prior counsel's illness got in the way of work.   There were other depositions scheduled and conducted in that time.   And Officer Driskill's deposition was scheduled, but then cancelled by Plaintiff's side.

[322] Third Affidavit in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 79) ¶ 5.

[323] *Id.*

[324] *Id.*   As explained in note 321, Ms. Anderson had more than enough time to depose these persons already.

it would.  Indeed, to the extent there is anything in the record on this point, it suggests that Officer

Driskill was away from the immediate area around Mr. Warren at this point.  "Rule 56(d) does not

condone a fishing expedition where a plaintiff merely hopes to uncover some possible evidence of

unlawful conduct."[325]   Second, Ms. Anderson has already had the opportunity to depose the

paramedic at the scene.[326]   She had (and used) the opportunity to ask about the whereabouts of

Officer Driskill and others during the time frame in question.  And third, as discussed in footnote

321, Ms. Anderson had more than enough time to depose the persons she now asks to depose.

In paragraph 5G, Ms. Anderson says she "would like to take the depositions of Officers

Santos Berumen, Nathan Krupin, and Doyne Driskill to discuss records that establish that the

officers knew about Rayshawn Warren's mental disorder before" the night of the arrest.[327]   In

addition to the other problems previously identified with the request to depose a bunch of persons

who could have been deposed earlier, Ms. Anderson does not require this information for purposes

of effectively challenging summary judgment.  That is because the Court has concluded above that

summary judgment is appropriate even under the assumption that Officer Driskill knew of Mr.

Warren's mental illness.[328]

In paragraph 5H, Ms. Anderson says she "would like to take the deposition of Blytheville

city officials who were involved in the previous arrest and prosecution of Rayshawn Warren that

---

[325] *Toben*, 751 F.3d at 895 (quoting *Duffy v. Wolle*, 123 F.3d 1026, 1041 (8th Cir. 2014)).

[326] *See* Ex. 10 to Defs.' Statement of Material Facts (Doc. 27-10); Ex. 6 to Pl.'s Amended Resp. to Defs.' Mot. for Summ. J. (Doc. 51-5).

[327] Third Affidavit in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 79) ¶ 5.

[328] *See supra* pages 25, 26, and 28; note 203.  To the extent the Court did not explicitly make reference to mental illness in every subsection above, the Court wishes to make clear that its conclusion in each subsection (analyzing each particular physical interaction) remains the same even assuming Officer Driskill knew about Mr. Warren's mental illness.  That factor is certainly part of the mix in analyzing each physical interaction, but it does not in the circumstances present in this case alter the reasonableness of any of the force used.

led to him being placed on misdemeanor probation in the City of Blytheville, Arkansas."[329]  But Ms. Anderson doesn't say why.  So, she cannot meet the 56(d) standard.  If Ms. Anderson wants to impute knowledge of Mr. Warren's mental illness to Officer Driskill, that is not a good justification for 56(d) relief in this case.  As just discussed, the Court's decision above concludes that summary judgment is appropriate even under the assumption that Officer Driskill knew of Mr. Warren's mental illness.

In the end, Ms. Anderson has no persuasive justification for seeking Rule 56(d) relief to delay a ruling on summary judgment.  While there is no question that her original attorney could have served her better and more aggressively conducted discovery (in the time period before his illness interfered with his work), Ms. Anderson cannot identify further information that she would likely obtain from additional discovery which would allow her to overcome the Defendants' Motion for Summary Judgment.  She has the three bodycam videos; she has deposition testimony from the paramedic at the scene; she has medical reports regarding the cause of death; she has reports about Mr. Warren's mental status.  In short, this case is appropriate for summary judgment resolution now.  There's no persuasive reason to wait longer.

---

[329] Third Affidavit in Supp. of Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 79) ¶ 5.

## <u>Conclusion</u>

For all of the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in its entirety.  Judgment will be entered in Defendants' favor.

IT IS SO ORDERED this 26th day of July 2021.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT COURT